McMILLAN, Judge.
 

 The appellant, Rick Allen Belisle, was convicted of murdering Joyce Moore during the course of a robbery and a burglary, offenses defined as capital by §§ 13A-5-40(a)(2) and 13A-5-40(a)(4), Ala.Code 1975. The circuit court sentenced Belisle to death. This appeal followed.
 

 
 *269
 
 The circuit court made the following findings of fact in its order sentencing Belisle to death:
 

 “The Court finds the facts of this case to be that in May of 1999, the defendant, Rick Allen Belisle, and his wife and co-defendant, Annette Belisle, were in desperate need of money and they together planned to burglarize the T & J [Kwik] Mart at the intersection of Highway 205 and 431 in Boaz, Alabama. Annette Be-lisle had worked at the store for a period of time and Rick Belisle had come there on occasion and assisted Annette Belisle. Both Annette Belisle and the defendant had access to the combination of the floor safe where the money was kept. The two had been to the store and had been seen in the store a couple of times on nights just prior to the incident. Rick and Annette Belisle had been ‘casing’ the store and finalizing their plans for the burglary. On May 19, 1999, the defendant and Annette Belisle went to the store just prior to closing and were seen in the store by others. Annette Belisle had on other occasions distracted the cashier working in order for Rick Belisle to check out a good place to hide and wait for the store to close. On one occasion another cashier noticed Rick Belisle had gone to the bathroom for an extended period of time and she became suspicious of them. On the night of May 19, 1999, the defendant hid in the ceiling of the bathroom and Annette Be-lisle left the store with the knowledge that Rick Belisle was hiding in the bathroom ceiling. After Joyce Moore closed the store, Rick Belisle confronted Joyce Moore, viciously attacked her with a large can of peas and a metal pipe which was part of an electric fan stand. The victim endured extreme pain and suffering before she died. After she was beaten to the point she was dying and lying face down on the floor in her own blood, she would raise up on her arms begging for help, and the defendant hit her again several times with the metal pipe, knocking her arms under her so she could not push up. Joyce Moore then died as a result of the injuries inflicted on her by Rick Belisle. He left the store, went home and told Annette Beli-sle about the events at the store. Both Annette and Rick Belisle fled the State and went to Missouri where law enforcement officers found them after investigation. Rick Belisle stated in an unsolicited response to. an investigator during a phone conversation, ‘You know what happened in Alabama was an accident.’ Then defendant in the same conversation denied any wrongdoing.”
 

 (C.R. 506.)
 

 The State’s evidence also tended to show the following: Dr. Stephen Pustilnick, the coroner who conducted the autopsy on Moore’s body, testified that she died of blunt-force trauma to the head. She sustained six blows to the front of her head and approximately eight blows to the back of her head. The blows were consistent, he said, with having been made by a flat rod or a can containing food. A six-pound can of peas was identified as one of the murder weapons.
 

 In exchange for a 20-year sentence, Annette agreed to testify against her husband Rick Belisle. Annette testified that, before the murder, she and her husband were both out of work, had no money, and could not 'buy food. Approximately two weeks before the murder, she said, she and Rick discussed robbing the T & J Kwik Mart convenience store. She knew the store because she had worked there and had quit working at the store about three weeks before the murder. She said that two days in advance of the incident, she and Rick went to “case” the store. On May 19, 1999, they both went to the store
 
 *270
 
 and talked with Moore. She said that Rick left and came back in the store while Moore was busy with customers. Annette said that Rick never came out of the store, and that she left the store at around 10:00 p.m. and walked back to their house to wait on Rick. Rick got home, she said, at around 12:30 a.m. and told her that he had killed Moore. He told her that Moore was choking on her own blood and tried to get up, so he kept hitting her until she stopped. Rick had $898 in cash and $70 in rolled change when he came back to their house. Annette said that they flushed the coin wrappers down the toilet and put the change in a coffee can. The next day, she went to a liquor store and a grocery store and spent some of the cash. About two days after the murder, she said, they sold most of their belongings and went to Missouri, where they both had family.
 

 Defense counsel conducted an extensive cross-examination of Annette that consisted of 353 pages of the transcript. Counsel attempted to impeach her with discrepancies in her statements to police and her trial testimony. State witnesses corroborated portions of Annette’s testimony. Witnesses testified that they saw the couple at the store two different times in the two days before the murder. Another testified that on the evening of the murder he saw Annette walking down the road from the Kwik Mart with a dog. Others testified that Rick and Annette had no money and had tried to borrow money to buy food and that Annette spent large sums of money on the day after the murder. Also, with Annette’s assistance, police recovered some of the items taken from the store. Coin wrappers were also recovered from the septic tank connected to the Belisle home in Boaz.
 

 Belisle’s defense was to cast the blame for the murder on Annette. The defense presented the testimony of three inmates who had been incarcerated with Annette. Kitty Hyatt, a fellow inmate at the Marshall County jail, testified that Annette told her that she was present at the murder but that she did “not do the initial act.” Valeire Wheeler, an inmate at Tutwiler Prison, testified that she overheard Annette talking to another inmate about the murder, and that Annette said that she hit Moore with a can and that the man with her hit Moore with an iron bar. Juanita Pitts, another inmate at Tutwiler, testified that Annette told her that she struck the initial blow with a can and asked Rick to help her continue the attack.
 

 The jury convicted Belisle of both counts of capital murder charged in the indictment. Belisle waived his sentencing hearing before a jury, and the circuit court ordered that a presentence report be prepared. Belisle also waived the presentation of mitigating evidence. After a hearing, the trial court sentenced Belisle to death. This appeal, which is automatic in a death case, followed. See § 13A-5-55, Ala.Code 1975.
 

 Standard of Review
 

 Belisle has been sentenced to death. According to Rule 45A, Ala.R.App.P., this Court must review the record of the lower court proceedings for plain error. Rule 45A, Ala.R.App.P., states:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error, has or probably has adversely affected the substantial right of the appellant.”
 

 The plain-error standard of review is to be used sparingly and “ ‘ “ ‘solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” ’ ”
 
 Centobie
 
 
 *271
 

 v. State,
 
 861 So.2d 1111, 1118 (Ala.Crim.App.2001) (quoting other cases).
 

 Guilt-Phase Issues
 

 I.
 

 Belisle argues that he was denied his constitutional right to a speedy trial, in violation of
 
 Barker v. Wingo,
 
 407 U.S. 514, 92 S.Ct. 2182, 38 L.Ed.2d 101 (1972), because of the four-year delay between his arrest and his capital-murder trial.
 

 Moore was murdered in May 1999, Beli-sle was indicted and arrested in June 1999, and he was tried in July 2003. The delay between Belisle’s arrest and his capital-murder trial was 49 months.
 

 As the Alabama Supreme Court stated in
 
 Ex parte Walker,
 
 928 So.2d 259, 263 (Ala.2005):
 

 “An accused’s right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by Art. I, § 6, of the Alabama Constitution, 1901. As noted, an evaluation of an accused’s speedy-trial claim requires us to balance the four factors the United States Supreme Court set forth in
 
 Barker [v. Wingo,
 
 407 U.S. 514 (1972) ]: ‘[l]ength of delay, the reason for the delay, the defendant’s assertion of [her] right, and prejudice to the defendant.’ 407 U.S. at 530, 92 S.Ct. 2182 (footnote omitted).
 
 See also Ex parte Carrell,
 
 565 So.2d [104] at 105 [ (Ala.1990) ]. ‘A single factor is not necessarily determinative, because this is a “balancing test, in which the conduct of both the prosecution and the defense are weighed.” ’
 
 Ex parte Clopton,
 
 656 So.2d [1243] at 1245 [ (Ala.1985) ] (quoting
 
 Barker,
 
 407 U.S. at 530, 92 S.Ct. 2182). We examine each factor in turn.”
 

 (Footnotes omitted.)
 

 A.
 
 Length of delay.
 
 As the
 
 Ex parte Walker
 
 court stated concerning the length of the delay:
 

 “In
 
 Doggett v. United States,
 
 the United States Supreme Court explained that the first factor — length of delay — ‘is actually a double enquiry.’ 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The first inquiry under this factor is whether the length of the delay is ‘ “presumptively prejudicial.” ’ 505 U.S. at 652, 112 S.Ct. 2686 (quoting
 
 Barker,
 
 407 U.S. at 530-31, 92 S.Ct. 2182). A finding that the length of delay is presumptively prejudicial ‘triggers’ an examination of the remaining three
 
 Barker
 
 factors. 505 U.S. at 652 n. 1, 112 S.Ct. 2686 (‘[A]s the term is used in this threshold context, “presumptive prejudice” does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the
 
 Barker
 
 enquiry.’).
 
 See also Roberson v. State,
 
 864 So.2d 379, 394 (Ala.Crim.App.2002).
 

 “In Alabama, ‘[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant — whichever is earlier — to the date of the trial.’
 
 Roberson,
 
 864 So.2d at 394.
 
 Cf.
 
 § 15-3-7, Ala.Code 1975 (A prosecution may be commenced within the meaning of this chapter by finding an indictment, the issuing of a warrant or by binding over the offender.’); Rule 2.1, Ala.R.Crim.P. (‘All criminal proceedings shall be commenced either by indictment or by complaint.’). The length of the delay in this case was approximately 50 months: Walker was indicted on January 14, 2000, and she pleaded guilty on March 25, 2004.
 
 See Carrell,
 
 565 So.2d at 107 (calculating the length of delay from defendant’s indictment until his plea of guilty). The State concedes (and both the trial court and the Court of Criminal Appeals held) that
 
 *272
 
 the 50-month delay in Walker’s case was presumptively prejudicial.”
 

 928 So.2d at 263-64 (footnotes omitted). Here, there is no question that the delay was presumptively prejudicial. Accordingly, we examine the remaining factors set out in
 
 Barker v. Wingo.
 

 B.
 
 Reasons for the delay.
 
 The following time line is helpful in evaluating this
 
 Barker
 
 factor:
 

 November 1999 — Defense counsel moved
 
 for
 
 a continuance.
 

 May 2000 — Defense counsel moved for a continuance.
 

 May 2000 — March 2002 — Numerous motions are filed by defense counsel, e.g., motion for a DNA expert and motion for juror questionnaires.
 

 January 2001 — Defense counsel withdrew because he had never tried a capital case. New counsel was appointed.
 

 July 2001' — Case continued on Belisle’s motion.
 

 July 2001 — District attorney’s office re-cused itself.
 

 October 2001 — Member of attorney general’s office assigned to prosecute case.
 

 August 2001 — Case continued on agreement of both parties.
 

 March 2002 — Defense counsel moved to withdraw due to a conflict of interest and motion was granted.
 

 September 2002 — Defense counsel filed motion for a speedy trial.
 

 December 2002 — Defense counsel moved to withdraw due to a conflict of interest and motion was granted.
 

 December 2002 — Defense counsel moved for a continuance.
 

 February 2003 — Different prosecutors appointed to prosecute case for the State.
 

 It appears that the majority of the delays were due to motions filed by Belisle. “Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is - not weighted against the State.
 
 Barker,
 
 407 U.S. at 531, 92 S.Ct. 2182.”
 
 Ex parte Walker,
 
 928 So.2d at 265.
 

 C.
 
 Assertion of right to speedy trial.
 
 Belisle did not assert his right to a speedy trial until September 2002 — 10 months before he was tried.
 

 “An accused does not waive the right to a speedy, trial simply by failing to assert it.
 
 Barker,
 
 407 U.S. at 528, 92 S.Ct. 2182. Even so, courts applying the
 
 Barker
 
 factors are to consider in the weighing process whether and when the accused asserts the right to a speedy trial, 407 U.S. at 528-29, 92 S.Ct. 2182, and not every assertion of the right to a speedy trial is weighted equally.
 
 Compare Kelley v. State,
 
 568 So.2d 405, 410 (Ala.Crim.App.1990) (‘Repeated requests for a speedy trial weigh heavily in favor of an accused.’),
 
 with Clancy v. State,
 
 886 So.2d 166, 172 (Ala.Crim.App.2003) (weighing third factor against an accused who asserted his right to a speedy trial two weeks before trial, and stating: ‘ “The fact that the appellant did not assert his right to a speedy trial sooner ‘tends to suggest that he either acquiesced in the delays or suffered only minimal prejudice prior to that date.’ ” ’)(quoting
 
 Benefield v. State,
 
 726 So.2d 286, 291 (Ala.Crim.App.1997), additional citations omitted), and
 
 Brown v. State,
 
 392 So.2d 1248, 1254 (Ala.Crim.App.1980) (no speedy-trial violation where defendant asserted his right to a speedy trial three days before trial).”
 

 Ex parte Walker,
 
 928 So.2d at 265-66.
 

 D.
 
 Prejudice to the defendant.
 
 Belisle never argued at trial how he was prejudiced by the denial. In his brief to this
 
 *273
 
 Court, Belisle merely states that he was prejudiced because witnesses “suffered from memory lapses.” He then cites a string of page numbers in the record. As the Alabama Supreme Court stated in
 
 Ex parte Walker:
 
 “Walker ... has neither alleged nor proved how the delay
 
 actually impaired her defense,
 
 and both the trial court and the Court of Criminal Appeals rejected Walker’s speedy-trial claim because of her failure to establish actual prejudice.” 928 So.2d at 267 (emphasis added).
 

 After reviewing the
 
 Barker v. Wingo
 
 factors, we find no evidence that Belisle was denied his constitutional right to a speedy trial. Accordingly, the circuit court correctly denied Belisle’s motion to dismiss for lack of a speedy trial.
 

 II.
 

 Belisle next argues that numerous pretrial rulings denied him a fair trial. He cites several different grounds in support of this assertion. We will address each claim individually.
 

 A.
 

 Belisle first argues that the circuit court erred in denying his motion to depose the State’s expert witnesses — a forensic examiner, a polygraph expert, and the coroner who performed the autopsy on the victim. He cites
 
 Ex parte Monk,
 
 557 So.2d 832 (1989), for the proposition that he was entitled to broader discovery because he was charged with capital murder.
 

 When this motion was discussed at a pretrial motion hearing the following occurred:
 

 “[The Court]: Motion for Deposition of State Witnesses and Request for Production of Documents.
 

 “What specifically are you asking for? Since you’ve got an open file rule. With regard to producing the documents, they should all be there. With regard to granting a deposition of State witnesses, unless there’s a mental health professional down the road that has to be deposed, I don’t plan on granting any depositions.
 

 “[Defense counsel]: I don’t have any right now that I need to depose.
 

 “The Court: Okay. If that does come up, just bring it to my attention.”
 

 (R. 184-85.)
 

 Belisle filed a discovery motion pursuant to
 
 Ex parte Monk.
 
 The circuit court granted the motion and allowed Belisle access to the prosecution’s entire case file. Belisle also moved to inspect all of the physical evidence that had been collected by the State. At the bottom of this motion the circuit court wrote: “Resolved by agreement, but if anything needs testing, defendant to file motion with respect to that particular item of evidence.” Belisle also moved that he be given access to all of the materials involving polygraph tests that had been administered to any witnesses. That motion was also granted. Also, the circuit court did grant a motion to conduct a videotaped deposition of the coroner who performed the autopsy on Moore.
 

 In
 
 Wilson v. State, 777
 
 So.2d 856, 926 (Ala.Crim.App.1999), we addressed a similar issue and stated:
 

 “The appellant’s eighteenth argument is that the trial court erred when it denied him discovery that was allegedly critical to his defense. Specifically, he contends that the trial court should have granted his motion to depose the State’s expert witnesses before trial so he could adequately prepare his defense. Although it denied the appellant’s motion to depose the State’s expert witnesses, the trial court did order the State to identify the expert witnesses it intended to call at trial and to produce the curric
 
 *274
 
 ulum vitae, certificates, qualifying documents, and other background documents necessary for the defense to assess the qualifications of the experts. (C.R. 125.)
 

 “ ‘In Alabama, there is no constitutional right to discovery in a criminal case. Rule 16, Alabama Rules of Criminal Procedure, affords an accused, a limited right of discovery in a pending criminal action. The extent of discovery is within the discretion of the trial court.’
 

 “Ex parte Land,
 
 775 So.2d 840 (Ala.Cr.App.1998), overruled on other grounds, 775 So.2d 847 (Ala.[2000]).
 
 See also Pace v. State,
 
 714 So.2d 320 (Ala.Cr.App.1996), rev’d in part, 714 So.2d 332 (Ala.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998);
 
 Bass v. State,
 
 417 So.2d 582 (Ala.Cr.App.), writ denied, 417 So.2d 588 (Ala.1982). Rule 16, Ala.R.Crim.P., does not specifically provide that every criminal defendant is entitled to depose the State’s expert witnesses. In this case, the appellant has not shown that deposing the State’s expert witnesses was critical to his defense. During the discovery process, he received documentary evidence from which he could prepare to impeach the credibility, training, and expertise of, as well as the conclusions reached by, the State’s expert witnesses. Furthermore, the experts did not testify about highly technical or ‘arcane’ subject matter as the appellant alleges. Therefore, the appellant has not shown that the trial court abused its discretion in denying his request.
 
 See Maples v. State,
 
 758 So.2d 1 (Ala.Cr.App.1999).”
 

 For the foregoing reasons, we find no error.
 

 B.
 

 Belisle next argues that the circuit court erred in directing him to refrain from filing any pro se motions. He asserts that this ruling violated his right to prepare and present his own defense.
 

 In an order addressing certain pretrial motions the circuit court stated:
 

 “This Court orders (for the defendant’s own protection, to prevent unnecessarily taking up the time of his attorneys, the State’s attorneys, and the Court’s own time) that the defendant refrain from filing pro se motions and that he consult with his attorneys before filing anything in the court file. The defendant should also refrain from attempting to communicate directly with the undersigned judge and should always make any communications with the Court through his attorneys after due notice to the State’s attorneys, except in making proper ex parte motions.”
 

 (C.R. 75.) Belisle never objected to the court’s ruling.
 

 A defendant has no right both to represent himself and to have the assistance of counsel. As we stated in
 
 Bush v. State,
 
 695 So.2d 70, 106 (Ala.Crim.App.1995):
 

 “Although a defendant has a Sixth Amendment right to be represented by counsel or to represent himself, he does not have the constitutional right to hybrid representation.
 
 Holland v. State,
 
 615 So.2d 1313 (Ala.Cr.App.1993);
 
 Christianson v. State,
 
 601 So.2d 512 (Ala.Cr.App.1992), overruled on other grounds,
 
 Ex parte Thomas,
 
 659 So.2d 3 (Ala.1994). The decision to permit a defendant to serve as co-counsel rests in the sound discretion of the trial court.
 
 United States v. Mills,
 
 704 F.2d 1553 (11th Cir.1983);
 
 Hunt v. State,
 
 659 So.2d 933 (Ala.Cr.App.1994), aff'd, 659 So.2d 960 (Ala.), cert. denied, [516] U.S. [880], 116 S.Ct. 215, 133 L.Ed.2d 146 (1995).”
 

 
 *275
 
 The circuit court acted within its discretion when it refused to allow Belisle to act as his own cocounsel.
 

 C.
 

 Belisle further argues that the circuit court erred in denying his pretrial motion to disclose the psychiatric and psychological history of his codefendant — Annette Belisle.
 

 The record reflects that Belisle filed a pretrial motion directing the attorney general’s office to provide him with Annette’s psychiatric and behavioral history; specifically, any disciplinary incidents at schools she attended, any arrests, and any interviews by mental-health personnel. He further requested that the circuit court direct her to undergo a psychiatric evaluation. At the hearing on this motion, the following occurred:
 

 “The Court: Now, they’re asking specifically for Annette Belisle’s psychiatric and behavioral history.
 

 “[Prosecutor]: I’ll just tell you what I’m thinking, Judge. Certainly, anything that I know, if she’s been tested or— anything that I’m aware of or that ... any law enforcement is aware of.
 

 “The Court: All right.
 

 “[Prosecutor]: But the other thing I’m concerned about is that it’s privileged.
 

 “The Court: Well, one thing that he’s asking for is — he’s asking in addition to that, that she be tested. Now, I’m going to deny that. There’s no way, I don’t think, under the law that I can order her to be tested. If the State is aware of any, by that I’m talking about law enforcement officers or the prosecution, is aware of any psychological history that she has I think, because of the privilege attached to it and she’s not a party to this case, you can’t go looking for it. But if you happen to have something that is in a file somewhere — it should be in here anyway — but in the event that it is, if you’ll present it to me in camera then I’ll make the decision as to whether or not it can be disclosed.”
 

 (R. 174-75.)
 

 The record shows that Belisle also filed a motion to produce the criminal histories of the State witnesses. On the motion the circuit court wrote: “Granted insofar as providing NCIC [National Crime Information Center] report to Court within 30 days and Court will inform defense counsel of the arrests and convictions of witnesses of State.” (C.R. 287.) Belisle was given access to Annette’s criminal history. Also, at the pretrial hearing addressing this issue, the State said that it would disclose any mental-health history within its knowledge.
 

 Moreover, there was no indication that Annette had any history of mental-health problems. Mental-health records are privileged; however, “this statutory privilege may, under certain circumstances, give way to a defendant’s Sixth Amendment right of confrontation and cross-examination.”
 
 Schaefer v. State,
 
 695 So.2d 656, 661 (Ala.Crim.App.1996)(on return to remand). The defendant must first allege that the privileged documents contain evidence that is material and relevant to the witness’s credibility. See
 
 D.P. v. State,
 
 850 So.2d 370 (Ala.Crim.App.2002). Here, there was no indication that any such records existed. Accordingly, we find no error. See
 
 Schaefer v. State,
 
 supra.
 

 D.
 

 Belisle also argues that the circuit court erred in denying his motion to disclose the juvenile records of all of the prosecution witnesses because, he argues, “no viable alternative means of obtaining this impeachment evidence existed.”
 

 
 *276
 
 At a pretrial hearing concerning this issue, the following occurred:
 

 “Motion to Produce the Record of all Juvenile Court Proceedings Involving any Prosecution Witness.
 

 “[Prosecutor]: I’m not so sure we can.
 

 “The Court: I don’t think that can be done either without the Court ordering it. But, under the law, that’s not required. I’m going to deny that motion.
 

 “[Defense counsel]: Your Honor, there’s a case out there, and I’m not aware of the name, where the Supreme Court did allow the record to be produced in order for impeachment purposes, and I think the Supreme Court said the only reason it was doing it was because the punishment was so severe in a capital case that it was going to give the defense the right to review those records for impeachment purposes.
 

 “[Prosecutor]: May I elaborate—
 

 “The Court: Yes.
 

 “[Prosecutor]: — -to clarify. And I may have the wrong case. I believe that is where a witness testified, Your Honor, and had a juvenile adjudication and the disposition of that adjudication was pending and it was—
 

 “The Court: To show bias.
 

 “[Prosecutor]: — whether or not there was a deal was made. And it was for that limited purpose that it was offered.
 

 “The Court: I was going to say, that certainly — if that were the case and if there was any witness in that position, I would say this: I would expect the State to provide that information to the defense, if you have a witness who has a juvenile adjudication, but the disposition of the case is still open pending their testimony in this case. But otherwise, it will be denied.”
 

 (R. 164-65.)
 

 The United States Supreme Court in
 
 Davis v. Alaska,
 
 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), held that a witness’s juvenile record is not admissible for purposes of general impeachment, but may be relevant to show bias. In
 
 Davis,
 
 the appellant was on probation for a juvenile offense at the time of his testimony. The United States Supreme Court held that his juvenile probationary status, at the time of trial, was relevant to show bias and was admissible. See
 
 Smith v. State,
 
 795 So.2d 788 (Ala.Crim.App.2000).
 

 Here, the circuit court complied with the holding in
 
 Davis,
 
 and directed the State to disclose any juvenile records that were still pending disposition. The circuit court’s ruling was consistent with the law.
 

 E.
 

 Belisle argues that the circuit court erred in denying his motion to disclose any possible biases on the part of the attorney general.
 

 The record shows that the following occurred when this motion was discussed at a pretrial healing:
 

 “The Court: I thought they were supposed to be somewhat biased. You know, not to the point of being overzealous, but at least I would expect there to be some bias on their part. I’m going to — if there’s any reason for disqualification that any of you may have, I’m sure you will let the Court know of that; correct?
 

 “[Prosecutor]: Yes, Your Honor.”
 

 (R. 178-79.) The circuit court did direct the attorney general’s office to disclose any bias that was within that office’s knowledge. Belisle’s argument is not supported by the record.
 

 
 *277
 
 F.
 

 Belisle further argues that the circuit court erred in denying his motion to disclose past and present relationships between the district attorney, the former disteict attorney, the attorney general, and any prospective jurors.
 

 When discussing this motion, the circuit court stated:
 

 “I was going to say, my experience has been, both as a defense lawyer and a prosecutor, that I may know some people out there and I might be able to disclose that relationship that I have with them and then not recognize someone from seven years ago that they remember, hey, I knew him and bla, bla, bla. So I found usually you get a better response by asking a juror.”
 

 (R. 181-82.) Clearly, the least intrusive method of discovering a juror’s past or present relationship with any of the prosecution team is to ask the prospective jurors during voir dire examination. “Discovery matters are within the sound discretion of the trial judge.
 
 Williams v. State,
 
 451 So.2d 411 (Ala.Cr.App.1984). The court’s judgment on these matters will not be reversed absent a clear abuse of discretion and proof of prejudice resulting from the abuse.
 
 Ex parte Harwell,
 
 639 So.2d 1335 (Ala.1993).”
 
 Parker v. State,
 
 777 So.2d 937, 938 (Ala.Crim.App.2000). There was no abuse of the circuit court’s discretion here.
 

 G.
 

 Belisle argues, in one paragraph of his brief, that the circuit court erred in failing to sua sponte order a change of venue based on the publicity surrounding the case.
 

 A review of the record shows that Beli-sle did not move for a change of venue. Therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 In a footnote in this section of Belisle’s brief, Belisle argues that seven jurors indicated during voir dire that they could not be fair. We have reviewed the extensive voir dire in this case. Prospective jurors D.D., K.C., T.D., and P.R. were removed for cause based on their responses during voir dire.
 
 [1]
 
 Three jurors, C.D., C.T., and M.A. were removed by Belisle’s use of his peremptory strikes.
 
 [2]
 
 Juror B.S. was removed by the State’s use of a peremptory strike.
 

 Those not struck for cause who said that they had heard about the case also indicated that what they had heard or read would have no impact on their ability to be impartial. As this Court stated in
 
 Taylor v. State,
 
 808 So.2d 1148, 1203-04 (Ala.Crim.App.2000):
 

 “Taylor next argues that the trial court erred in not sua sponte moving the trial to another venue because of alleged extensive pretrial publicity. Taylor never moved for a change of venue before the trial court, nor did he present any evidence before the trial court concerning pretrial publicity. The only evidence before us now concerning pretrial publicity is the answers to voir dire questions concerning the jurors’ knowledge of the case as a result of media coverage. We will review this issue for plain error only. Rule 45A, Ala.R.App.P.
 

 “Media publicity can prejudice prospective jurors and thereby result in a denial of a defendant’s right to an impartial jury.
 
 Chandler v. Florida,
 
 449
 
 *278
 
 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). In order to get a change of venue based on pretrial publicity, the defendant must prove that there existed actual prejudice against the defendant as a result of the publicity or that the community was saturated with prejudicial publicity.
 
 Sheppard v. Maxwell,
 
 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Newspaper articles or widespread publicity, without more, is insufficient to grant a motion for a change of venue.
 
 Anderson v. State,
 
 362 So.2d 1296, 1298 (Ala.Cr.App.1978).
 

 “Our review of the voir dire examination concerning pretrial publicity indicates that, while many venire members had heard something about the case from the media, there were no grounds to warrant a change of venue. See,
 
 Stewart v. State,
 
 730 So.2d 1203, 1241 (Ala.Cr.App.1996). No plain error occurred in the trial court’s failure to sua sponte order a change of venue.”
 

 The record shows that the circuit court did not err in not sua sponte ordering that Belisle’s trial be moved to another venue. There were no grounds to warrant a change of venue in this case. See
 
 Taylor.
 

 III.
 

 Belisle next argues that Belisle’s grand and petit juries were improperly drawn because, he argues, Marshall County has two divisions and the juries were not drawn from the correct division — the Al-bertville Division. He cites the Alabama Supreme Court’s opinion in
 
 Ellis v. Pope,
 
 709 So.2d 1161 (Ala.1998), to support his argument.
 

 Belisle did not bring this matter to the circuit court’s attention; therefore, we are limited to applying a plain-error standard of review. See Rule 45A, Ala.R.App.P.
 

 “In
 
 Ellis [v. Pope,
 
 709 So.2d 1161 (Ala.1998) ], the Alabama Supreme Court held Act. No. 96-454, Acts of Alabama, 1996, unconstitutional. That Act set up Coffee County’s system of calling prospective jurors from the county as a whole and not solely from the division of the county where the offense occurred .... The Court in
 
 Ellis
 
 held that the Act was declared unconstitutional because it directly conflicted with Art. I, § 6, Alabama Constitution of 1901, which provides that prospective jurors be called from the particular ‘district’ where the offense occurred.”
 

 Ex parte Washington,
 
 716 So.2d 253, 254 (Ala.Crim.App.1998).
 

 There is no indication that the grand jury was improperly drawn from the entire county instead of the Albertville Division of Marshall County. The top of the indictment reads Grand Jury “Division: Albert-ville.” Belisle’s claim is not supported by the record.
 

 Neither is there any indication that the petit jurors were improperly drawn from the county as a whole. In fact, the opposite is true. The record shows that, at the beginning of voir dire, the circuit court specifically questioned the prospective jurors to ensure that they were from the proper division of Marshall County.
 

 There is no indication that the grand or petit juries were improperly drawn from the county as a whole and not the Albert-ville Division of Marshall County — the division where the murder occurred. Accordingly, we find no error.
 

 IV.
 

 Belisle argues that several fundamental errors made his conviction and death sentence unreliable.
 

 A.
 

 He first argues that it was error for the court to allow members of the
 
 *279
 
 victim’s family to be in the courtroom, despite the fact that several testified at trial. The record shows that Belisle never objected when the court excluded members of the victim’s family from operation of the rule excluding certain witnesses from the courtroom during the trial. See Rule 9.3, Ala.R.Crim.P., and Rule 615, Ala.R.Evid. Moreover, it is unclear from the record if any members of the victim’s family who testified were present in the courtroom throughout the trial. Only the victim’s mother and the victim’s sister-in-law testified.
 

 “From the record before us, we cannot determine how many family members were present in the courtroom. Furthermore, there is no indication that their presence prejudiced the appellant. Consequently, we do not find any plain error in this regard.”
 

 Wilson v. State, 777
 
 So.2d 856, 930-31 (Ala.Crim.App.1999). We likewise find no plain error.
 

 B.
 

 Belisle next argues that his attorney did not meet the statutory requirements for representing a capital defendant as set out in § 13A-5-54, Ala.Code 1975.
 
 [3]
 
 Specifically, he argues that lead counsel, Robert Hembree, informed the court that he had not been practicing criminal law for a long period before he was appointed to represent Belisle.
 

 Belisle had two attorneys appointed to represent him during his capital proceedings. He does not challenge the qualifications of the other attorney.
 
 [4]
 
 We have held that § 13A-5-54, Ala.Code 1975, requires only that one attorney meet the statutory requirements. “In
 
 Parker v. State,
 
 587 So.2d 1072 (Ala.Crim.App.1991), we held that when a person accused of a capital offense has one attorney whose experience meets that required in § 13A-5-54, the requirements of that section have been satisfied.”
 
 Hodges v. State,
 
 856 So.2d 875, 899 (Ala.Crim.App.2001). The circuit court ensured that one of the Beli-sle’s attorneys met the statutory requirements of § 13A-5-54, Ala.Code 1975.
 

 C.
 

 Belisle further argues that the court erred in denying his motion to sequester the jury.
 

 Even in a capital case there is no requirement that a court sequester the jurors during the trial. The decision to grant or deny a motion to sequester the jury during trial is within the sound discretion of the trial court. See
 
 Centobie v. State,
 
 861 So.2d 1111 (Ala.Crim.App.2001).
 

 The record shows that the circuit court on numerous occasions admonished the jury not to talk to anyone about the case. Each time the jurors returned after a recess, the court inquired as to whether anything had happened that would “affect their judgment in any way.” The court went out of its way to ensure that the jurors were not subjected to any outside influences. The court committed no error in denying Belisle’s motion to sequester the jury.
 

 V.
 

 Belisle further argues that he was improperly charged, tried, and convicted
 
 *280
 
 twice for the same offense in violation of the Double Jeopardy Clause. Specifically, he argues that the capital-murder statute defines several different methods of committing a capital offense and that he could be convicted of only one capital offense.
 

 This issue was never brought to the circuit court’s attention; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 Belisle was charged and convicted for two counts of capital murder for murdering Joyce Moore during the course of a burglary and a robbery, violations of §§ 13A-5-40(a)(2) and (a)(4), Ala.Code 1975. Both require proof of different elements — one a burglary and one a robbery — and do not offend the Double Jeopardy Clause. “A defendant can be convicted of two or more capital murders for the death of one victim, so long as those convictions are in accordance with
 
 Blockburger [v. United States,
 
 284 U.S. 299 (1932) ], i.e., so long as each conviction required an element not required in the other convictions.”
 
 Heard v. State,
 
 999 So.2d 992, 1009 (Ala.2007). See also
 
 Ex parte Haney,
 
 603 So.2d 412, 419 (Ala.1992);
 
 Ex parte Peraita,
 
 897 So.2d 1227 (Ala.2004);
 
 Ex parte McWilliams,
 
 640 So.2d 1015 (Ala.1993);
 
 Castillo v. State,
 
 925 So.2d 284 (Ala.Crim.App.2005);
 
 Flowers v. State,
 
 922 So.2d 938 (Ala.Crim.App.2005);
 
 White v. State,
 
 900 So.2d 1249 (Ala.Crim.App.2004);
 
 Wynn v. State,
 
 804 So.2d 1122 (Ala.Crim.App.2000);
 
 Barksdale v. State,
 
 788 So.2d 898 (Ala.Crim.App.2000);
 
 Freeman v. State,
 
 776 So.2d 160 (Ala.Crim.App.1999);
 
 Burtram v. State,
 
 733 So.2d 921 (Ala.Crim.App.1998);
 
 Hyde v. State,
 
 778 So.2d 199 (Ala.Crim.App.1998);
 
 Madison v. State,
 
 718 So.2d 90 (Ala.Crim.App.1997);
 
 Merriweather v. State,
 
 629 So.2d 77 (Ala.Crim.App.1993).
 

 Belisle’s convictions for two counts of capital murder for murdering Moore during the course of a burglary and a robbery do not violate the Double Jeopardy Clause.
 

 VI.
 

 Belisle next argues that he was denied his rights to due process, a fair trial, and equal protection of the law when the circuit court denied his motion for funds to hire a DNA expert.
 

 At the pretrial motion hearing concerning this issue, the circuit court stated that the motion was premature because no evidence connected to the crime had been linked to Belisle. The circuit court stated:
 

 “At this time the court will reserve ruling on the motion. I’m not denying it. I’m stating at this point I’m not going to appoint an expert, but I’m not denying it. If it becomes relevant then you’ll definitely get your expert.”
 

 (R. 60-61.) The State’s forensic tests were inconclusive — they did not link Beli-sle to any items recovered during the investigation. This matter was not brought up again. Also, at the pretrial hearing defense counsel stated: “If he’s excluded, Judge, I think we’ll be glad to stipulate to the State’s experts.” (R. 59.)
 

 The Alabama Supreme Court in
 
 Ex parte Dobyne,
 
 672 So.2d 1354 (Ala.1995), set out the standard for appointing forensic experts. The court stated:
 

 “[A] defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert.
 
 Dubose
 
 
 *281
 

 [v. State],
 
 662 So.2d [1189,] 1191 [ (Ala.1995) ]; see also,
 
 Smith v. State,
 
 623 So.2d 369 (Ala.Cr.App.1992), cert. denied, [510] U.S. [1030], 114 S.Ct. 650,126 L.Ed.2d 607 (1993);
 
 McLeod v. State,
 
 581 So.2d 1144 (Ala.Cr.App.1990);
 
 Siebert v. State,
 
 562 So.2d 586 (Ala.Cr.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990);
 
 Stewart v. State,
 
 562 So.2d 1365 (Ala.Cr.App.1989);
 
 McGahee v. State,
 
 554 So.2d 454 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala.1989).”
 

 672 So.2d at 1357-58. The Alabama Supreme Court has stated that there is no showing of a particularized need for a DNA expert when the State’s DNA test results are inconclusive. See
 
 Dubose v. State,
 
 662 So.2d 1189, 1194 (Ala.1995) (“The prosecution’s DNA results could have been exculpatory or inconclusive, thereby eliminating the need for a defense expert.”). Accordingly, Belisle failed to show a “particularized need” for obtaining a court appointed expert.
 

 VII.
 

 Belisle further argues that the circuit court erred in refusing to order that an electronic belt, capable of “stunning” the wearer, that Belisle was forced to wear when he was in the courtroom be removed during trial. Specifically, he argues that the use of the belt to maintain security in the courtroom deprived him of his presumption of innocence and his right to participate in his defense. He cites
 
 United States v. Durham,
 
 287 F.3d 1297 (11th Cir.2002), in support of his assertion.
 

 Our review of the record shows that Belisle never moved that the electronic belt be removed. This issue was never brought to the circuit court’s attention. Accordingly, we review this claim for plain error. See 45A, Ala.R.App.P.
 

 Because this matter was never brought to the circuit court’s attention, there is little discussion in the record about this claim. The record fails to indicate that Belisle was wearing the electronic belt until after the jury had been struck. When discussing the merits of a motion concerning the showing of Belisle’s tattoo to the jury, the circuit court mentioned that Beli-sle was wearing a electronic device around his waist, that the device was not visible, and that the device would be not be visible when Belisle showed the jury the tattoo on his back. There is no indication that the circuit court ordered the use of the electronic belt. Indeed, the record does not reflect how Belisle came to wear the device. However, what is clear is that the belt was not visible to the jury and was not activated during trial.
 

 We have approved of the use of a similar device — a “stun belt” — to maintain security in a courtroom. See
 
 Snyder v. State,
 
 893 So.2d 488 (Ala.Crim.App.2003). However, we have never had occasion to address this issue under the “plain error” standard of review.
 

 Belisle relies on
 
 Durham
 
 to support this argument. However, we believe that this case is more similar to
 
 Scieszka v. State,
 
 259 Ga.App. 486, 578 S.E.2d 149 (2003). The Georgia Court of Appeals in
 
 Scieszka
 
 distinguished the case of
 
 Durham
 
 based on the fact that the issue had never been presented to the trial court. The court stated:
 

 “As an initial matter, we note that there is nothing in the record indicating that it was the trial court that required Scieszka to wear the stun belt. Sciesz-ka’s trial attorney never objected to the belt or otherwise brought the matter to the trial court’s attention, and there was accordingly no ruling on the matter by the court.
 

 [[Image here]]
 

 
 *282
 
 “Our Supreme Court has held that the use ‘of a remedial electronic security measure’ is permissible where it is shielded from the jury’s view and where there is no evidence that defendant was harmed by its use.
 
 Young v. State,
 
 269 Ga. 478, 479(2), 499 S.E.2d 60 (1998). In the
 
 Young
 
 case, the court found that there was nothing in the record to show that the use of such an electronic device was ‘so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial.’ (Citation and punctuation omitted.)
 
 Id.
 
 In another case, the Supreme Court rejected the defendant’s argument regarding the use of a stun belt, finding that there was ‘nothing in the record to support [the defendant’s] contention that the device [ (although not visible to the jury) ] nonetheless had a detrimental psychological effect on his ability to participate in the trial.’
 
 Brown v. State,
 
 268 Ga. 354, 359-360(7), 490 S.E.2d 75 (1997). And in
 
 Stanford v. State,
 
 272 Ga. 267, 271(8), 528 S.E.2d 246 (2000), the court again found no merit to the defendant’s arguments regarding the use of an electronic security device because he failed to object to the device and because it was not visible to the jury.
 

 “Scieszka’s argument must similarly fail because he raised no objection to the use of the stun belt and thus did not obtain a ruling from the trial court on the issue. Moreover, the record is devoid of any evidence of harm or prejudice arising from the use of the stun belt at his trial.
 

 “And contrary to Scieszka’s assertion, the recent opinion by the Eleventh Circuit Court of Appeals in
 
 United States v. Durham,
 
 287 F.3d 1297 (11th Cir.2002), does not require a different result. In
 
 Durham,
 
 the Eleventh Circuit expressed serious concerns regarding the use of these devices and their effect on a defendant’s ability to participate in his defense.
 
 Id.
 
 at 1305-1306. Nevertheless, the defendant in that case had filed a motion seeking to prohibit the stun belt’s use, and the district court had ruled that the device could be used in light of the defendant’s history of escape attempts.
 
 Id.
 
 at 1302-1303. The Eleventh Circuit remanded the case, requiring the district court to make factual findings regarding the use of the stun belt and to consider on the record the use of less restrictive alternatives.
 
 Id.
 
 at 1307-1309. Thus,
 
 Durham
 
 is distinguishable from this case because the use of the stun belt in that case was court-sanctioned, following the defendant’s objection.”
 

 259 Ga.App. at 487-88, 578 S.E.2d at 150-51. For the reasons discussed in
 
 Scieszka,
 
 we refuse to find plain error when the issue was not brought to the court’s attention, when there is no evidence that Belisle was prejudiced, and when Belisle’s substantial rights have not been affected. Rule 45A, Ala.R.App.P.
 

 VIII.
 

 Belisle next argues that the circuit court erred in refusing to suppress two statements that he made to police. Belisle makes several different arguments as to why these statements should have been suppressed.
 

 A.
 

 Belisle argues that his first statement, which was made while in Missouri, should have been suppressed because, he argues, his arrest was not based on probable cause.
 

 In the motion to suppress filed by Beli-sle, Belisle admits that he was arrested by Missouri Police on outstanding traffic warrants. Belisle was not initially arrested
 
 *283
 
 for the murder charges but was arrested on unrelated outstanding traffic warrants. This claim, therefore, is not supported by the record. We find no plain error here. See Rule 45A, Ala.R.App.P.
 

 B.
 

 Belisle also argues that his second statement should have been suppressed because, he argues, he had invoked his right to counsel at the end of his first statement and police should not have approached him again.
 

 Gary Stanfield, chief investigator with the Boaz Police Department, testified at the suppression hearing that he went to Missouri after Belisle was arrested. He said that when he questioned Belisle, he read him his Miranda
 
 [5]
 
 rights and Belisle signed a rights wavier form. Stanfield said that he made no promises, that Belisle was not coerced, and that Belisle did not appear to be under the influence of any drugs. Belisle was a suspect because he and his wife had been seen around the shop several times before the murder and Belisle’s wife had previously worked at the store and knew the combination to the safe. At the end of his first interview, Belisle asked for counsel, and Stanfield ceased all questioning. Stanfield said that he told Belisle that, if he wanted to talk to him again, he would have to initiate the contact. Stanfield also said that the interview was handwritten because he did not have access to his recording devices in Missouri. Stanfield said that after his initial interview, Belisle made two collect telephone calls to him in Alabama. He said that he taped the conversations, but that the battery went dead and the first conversation was not fully recorded. In this statement, Belisle said that everything that happened in Alabama was an accident.
 

 There is no indication that Belisle was “in custody” when he made this second statement. Stanfield testified that Belisle called him on the telephone.
 

 “The evidence indicates that the telephone call by the appellant was unsolicited by [the police informant] and thus spontaneous. See
 
 Robinson v. State,
 
 [577 So.2d 928] at 930 [(Ala.Crim.App.1990)] (because a statement was voluntary and initiated by the defendant in a setting that did not involve interrogation, it was properly admitted, even though it was made to a police officer). In
 
 Cure v. State,
 
 600 So.2d 415 (Ala.Crim.App.1992), cert. denied, 600 So.2d 421 (Ala.1992), an officer listened in on a telephone conversation between the defendant, who was an inmate at the time, and a third party, who had requested the officer to monitor the conversation. This Court held that the defendant-inmate was not in custody within the meaning of
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), stating:
 

 “ ‘ “In recognizing ‘that a prison inmate is not automatically always in “custody” within the meaning of
 
 Miranda,’ United States v. Conley,
 
 779 F.2d 970, 973 (4th Cir.1985),
 
 cert. denied,
 
 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986), we hold that ‘custody1 or ‘restriction’ in the context of prison ‘necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement,’
 
 id.
 
 (quoting
 
 Cervantes v. Walker,
 
 589 F.2d [424, 428 (9th Cir.1978))]. ‘Thus, whether an inmate is “in custody” under
 
 Miranda
 
 depends on the circumstances of the case.’
 
 United States v. Cooper,
 
 800 F.2d 412, 414 (4th Cir.1986).”
 
 Arthur v. State, 575
 
 
 *284
 
 So.2d 1165, 1188 (Ala.Crim.App.1990), cert.
 
 denied,
 
 575 So.2d 1191 (Ala.1991).’ ”
 

 Smith v. State, 838
 
 So.2d 413, 441 (Ala.Crim.App.2002), quoting
 
 Cure v. State,
 
 600 So.2d 415, 419 (Ala.Crim.App.1992). Beli-sle was not in custody; thus, the
 
 Miranda
 
 requirements were
 
 not
 
 implicated. See
 
 Smith.
 

 C.
 

 Belisle also argues that the circuit court erred in allowing an incomplete recorded version of his statement to be introduced at trial.
 

 Here, Stanfield testified that the telephone conversation was only partially recorded because the batteries on the recorder went dead. Citing
 
 United States v. Marin,
 
 669 F.2d 73 (2d Cir.1982), he asserts that not introducing the entire statement biased him because, he argues, it prevented the jury from a fair and impartial understanding of the statement.
 

 In
 
 Marin,
 
 the United States Court of Appeals for the Second Circuit stated:
 

 “Rule 106 [, Fed.R.Evid.], provides as follows:
 

 “ ‘When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.’
 

 “We have interpreted this Rule to require that a statement be admitted in its entirety when this is necessary to explain the admitted portion, to place it in context, or to avoid misleading the trier of fact,
 
 see United States v. Rubin,
 
 609 F.2d 51, 63 (2d Cir.1979),
 
 aff'd,
 
 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981);
 
 United States v. Mulligan,
 
 573 F.2d 775, 778 (2d Cir.), cert.
 
 denied,
 
 439 U.S. 827, 99 S.Ct. 99, 58 L.Ed.2d 120 (1978); see also
 
 United States v. Jamar,
 
 561 F.2d 1103 (4th Cir.1977); Fed.R.Evid. § 106, Advisory Committee’s Note, or to ensure a ‘fair and impartial understanding” of the admitted portion,
 
 United States v. Capaldo,
 
 402 F.2d 821, 824 (2d Cir.1968),
 
 cert. denied,
 
 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969). The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages.
 
 See, e.g., United States v. McCorkle,
 
 511 F.2d 482 (7th Cir.), cert.
 
 denied,
 
 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975).
 

 “In the present case, the completeness doctrine did not require admission of Romero’s entire statement.”
 

 669 F.2d at 84-85 (footnote omitted).
 

 The completeness doctrine is contained in Rule 106, Ala.R.Evid., which states:
 

 “When a party introduces part of either a writing or recorded statement, an adverse party may require the introduction at that time of any other part of the writing or statement that ought in fairness to be considered contemporaneously with it.”
 

 In discussing this doctrine, this Court in
 
 Johnson v. State,
 
 823 So.2d 1, 39 (Ala.Crim.App.2001), stated:
 

 “Contrary to Johnson’s contention, the doctrine of completeness does not impose a ‘duty’ on the party offering a portion of a conversation to introduce the whole of that conversation. Rather, it affords the adverse party the right to introduce the remainder of the conversation.”
 

 Belisle was free to inquire into the contents of the entire conversation when he cross-examined Stanfield. There was no violation of Rule 106, Ala.R.Evid.
 

 
 *285
 
 For the foregoing reasons, we find that Belisle’s statements were properly received into evidence.
 

 IX.
 

 Belisle next argues that the circuit court erred in admitting evidence that was, he argues, seized pursuant to an illegal search of his vehicle.
 

 Belisle challenged neither his arrest nor the search of his vehicle at trial. Thus, the record contains little information pertinent to this issue. The record does show that Detective J.T. Cartee of the Albertville Police Department testified that, when Belisle was arrested in Missouri, he went to Missouri with two fellow officers. He said that while in Independence, Missouri, he searched a 1987 Plymouth Voyager van parked outside of Jody McIntyre’s residence — the friend with whom the Belisles were staying in Missouri. Inside the van, he found a coffee can full of change, a pair of work boots, and various other items. Cartee also testified that, while at the same residence, Annette Belisle gave police a blue denim shirt. It is clear that Annette was cooperating with police during their investigation in Missouri. We do not know whether there was a warrant to search the vehicle or whether Annette consented to the search. We can glean no other facts surrounding the vehicle’s search. The record is silent.
 

 As this Court stated in
 
 Eggers v. State,
 
 914 So.2d 883 (Ala.Crim.App.2004):
 

 “ ‘ “The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.”
 
 Ex parte Watkins,
 
 509 So.2d 1074, 1077 (Ala.1987). “Without any evidence in the record on appeal to support the allegation of error, this court cannot consider the alleged error even under the ‘plain error’ doctrine.”
 
 Kuenzel v. State,
 
 577 So.2d 474, 482 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
 

 “ ‘ “ ‘Even though ... this Court [is] required to search the record for plain error in every case in which the death sentence has been imposed and to take the appropriate action when such error is found, ... this Court will [not] presume that reversible error occurred at trial when there is nothing in the record to so indicate ....’”
 

 “
 
 ‘Id.,
 
 quoting
 
 Ex parte Godbolt,
 
 546 So.2d 991, 998 (Ala.1987).’ ”
 

 914 So.2d at 893, quoting
 
 Gavin v. State,
 
 891 So.2d 907, 987 (Ala.Crim.App.2003). For these reasons, we refuse to find plain error.
 

 X.
 

 Belisle argues that the circuit court erred in denying his various challenges for cause of certain prospective jurors.
 

 Initially, we note that none of the challenged jurors sat on Belisle’s jury. All were removed by peremptory challenges by both the defense and the State. As we stated in
 
 Calhoun v. State,
 
 932 So.2d 923 (Ala.Crim.App.2005):
 

 “The Alabama Supreme Court in
 
 Bethea v. Springhill Memorial Hospital,
 
 833 So.2d 1 (Ala.2002), returned to the harmless-error analysis when reviewing a circuit court’s refusal to remove a prospective juror for cause. The Supreme Court stated:
 

 “ ‘The application of a “harmless-error” analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
 

 “ ‘ “The appellant was convicted of the crime of murder in the sec
 
 *286
 
 ond degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.”
 

 “
 
 ‘Turner v. State,
 
 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in
 
 Swain v. Alabama,
 
 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds,
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that “[t]he denial or impairment of the right is reversible error
 
 without a shoiving of prejudice.”
 
 (Emphasis added [in
 
 Bethea'].)
 
 Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See
 
 Dixon v. Hardey,
 
 591 So.2d 3 (Ala.1991);
 
 Knop v. McCain,
 
 561 So.2d 229 (Ala.1989);
 
 Ex parte Rutledge,
 
 523 So.2d 1118 (Ala.1988);
 
 Ex parte Beam,
 
 512 So.2d 723 (Ala.1987);
 
 Uptain v. State,
 
 534 So.2d 686, 688 (Ala.Crim.App.1988)(quoting
 
 Swain
 
 and citing
 
 Beam
 
 and Rutledge);
 
 Mason v. State,
 
 536 So.2d 127, 129 (Ala. Crim.App.1988) (quoting Uptain).
 

 “ ‘... [Tjhis Court has returned to the “harmless-error” analysis articulated in the
 
 Ross v. Oklahoma,
 
 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and
 
 [United States v.] Martinez-Salazar,
 
 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an “impartial” jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
 

 “ ‘In this instance, even if the Be-theas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.’
 

 “833 So.2d at 6-7 (footnotes omitted). See also
 
 Dailey v. State,
 
 828 So.2d 340 (Ala.2001). As was the case in
 
 Bethea,
 
 Calhoun offers no evidence that the jury ultimately impaneled was biased; therefore, if error occurred it was harmless.”
 

 932 So.2d at 944-45 (footnote omitted). Cf.
 
 General Motors Corp. v. Jemigan,
 
 883 So.2d 646 (Ala.2003) (harmless-error analysis does not apply when the circuit court erroneously denied five challenges for cause).
 

 A.
 

 Belisle argues that prospective jurors C.D. and C.T. should have been removed for cause because, he argues, they indicated that they could not be fair. The record shows that juror C.D. initially indicated that he did not think he could be fair because he had worked in the Kwik Mart convenience store, and he knew the people who had originally built the store. When questioned by the State, C.D. indicated that he could base his decision on what he heard in the courtroom and that
 
 *287
 
 he would follow the law as instructed. Juror C.T. indicated that she had heard about the case. When further questioned, she indicated that she would listen to both sides and make a decision after she had heard all of the evidence.
 

 Though both of the jurors initially indicated possible biases, when further questioned they both revealed that they could be fair and impartial. As we stated in
 
 Johnson v. State,
 
 820 So.2d 842, 855 (Ala.Crim.App.2000):
 

 “Jurors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court. Cf.
 
 Hall v. State,
 
 [820] So.2d 113 (Ala.Cr.App.1999). Here, the jurors were questioned in depth by the court or the prosecutor concerning their views on capital punishment. Each indicated that he or she could follow the law as directed by the trial court. The trial court committed no error in denying Johnson’s challenges for cause of these potential jurors.”
 

 There was no error in failing to remove prospective jurors C.D. and C.T. for cause.
 

 B.
 

 Belisle also argues that the circuit court erred in not granting his challenge for cause of juror F.S. because, he argues, he indicated that he would give greater credence to a police officer’s testimony. We note that the reason Belisle challenged this juror was based on F.S.’s feelings toward the death penalty. However, the voir dire shows that this juror also indicated that he could follow the circuit court’s instructions and set his personal feelings aside.
 

 Belisle also argues that the circuit court should have sua sponte removed jurors J.S. and R.H. because they likewise indicated that they would give more weight to a police officer’s testimony. However, a review of the voir dire shows that both indicated that they could follow the law and be impartial. These jurors were all rehabilitated; thus, there was no reason to remove them for cause. See
 
 Johnson,
 
 supra.
 

 C.
 

 Belisle next argues that the circuit court erred in failing to sua sponte remove jurors for cause who indicated that they knew the victim and had grown up in the same community as the victim.
 

 As we stated in
 
 Taylor v. State,
 
 808 So.2d 1148, 1184-85 (Ala.Crim.App.2000):
 

 “ ‘ “[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury.”
 
 Brownlee v. State,
 
 545 So.2d 151, 164 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989) .... Instead, the test is “whether the [prospective] juror’s acquaintance with [the victim] or relative is’ such that it would result in probable prejudice.”
 
 Vaughn v. Griffith,
 
 565 So.2d 75, 77 (Ala.1990), cert. denied, 498 U.S. 1097, 111 S.Ct. 987, 112 L.Ed.2d 1072 (1991).’
 

 “Morrison v. State,
 
 601 So.2d 165, 168 (Ala.Cr.App.1992) (citations omitted). Because a veniremember’s mere acquaintance with a victim or a family member of a victim is not sufficient to justify a strike for cause, the trial judge did not err when it denied Taylor’s motion. There is no error here.”
 

 For the reasons stated in
 
 Taylor,
 
 the circuit court did not err in failing to sua
 
 *288
 
 sponte remove the jurors who knew the victim.
 

 D.
 

 Belisle also argues, as part of this issue in his brief, that the circuit court erred in death-qualifying the jury because, he argues, it created a conviction-prone jury, thereby violating his right to an impartial trial.
 

 “The United States Supreme Court in
 
 Lockhart v. McCree,
 
 476 U.S. 162 (1986), held that the United States Constitution does not forbid a capital defendant’s potential jury from being ‘death qualified’ and that to do so does not deprive a defendant of his constitutional right to an impartial jury. 476 U.S. at 173. Alabama has followed the holding in
 
 Lockhart v. McCree.
 
 See
 
 Johnson v. State,
 
 823 So.2d 1 (Ala.Crim.App.2001);
 
 Clemons v. State,
 
 720 So.2d 961 (Ala.Crim.App.1996).”
 

 Blackmon v. State,
 
 7 So.3d 397, 451 (Ala.Crim.App.2005) (opinion on application for rehearing). For these reasons, we find no error.
 

 XI.
 

 Belisle next contends that the prosecutor violated
 
 J.E.B. v. Alabama,
 
 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), by using his peremptory strikes in a gender-biased manner. The United States Supreme Court in
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), first held that it was a violation of the Equal Protection Clause to remove black prospective jurors based solely on their race. This holding was extended to white jurors in
 
 Powers v. Ohio,
 
 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to Asian jurors in
 
 Hernandez v. New York,
 
 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); and to gender-based challenges in
 
 J.E.B. v. Alabama.
 

 Here, there was no
 
 J.E.B.
 
 objection made after the peremptory strikes were conducted. Accordingly, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 “To find plain error in the context of a
 
 Batson
 
 or
 
 J.E.B.
 
 violation, the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’
 
 Ex parte Watkins,
 
 509 So.2d 1074, 1076 (Ala.1987). Here, the record shows that the State, struck nine males and nine females. The jury was composed of eight women and four men. There is no inference of purposeful discrimination in violation of
 
 J.E.B.
 
 Accordingly, we find no plain error.”
 

 Blackmon v. State,
 
 7 So.3d at 425-26.
 

 In this case, the strike list is part of the record but the list does not indicate the gender of the prospective jurors. As we stated in
 
 Flowers v. State,
 
 799 So.2d 966, 989 (Ala.Crim.App.1999) (opinion on return to remand):
 

 “There is absolutely no evidence in the record that the State violated
 
 Bat-son.
 
 The jury strike list is part of the record, but the list does not indicate the race or gender of the jurors. Nor is there any indication of the races of the selected jurors. We cannot say that the record raises an inference of purposeful discrimination. No plain error occurred here.”
 

 Accordingly, we can find no plain error here. See Rule 45A, Ala.R.App.P.
 

 XII.
 

 Belisle next argues that it was reversible error for the circuit court to allow the State to introduce a fingerprint card that, he argues, indicated that Belisle had previously been arrested. He cites
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986), to support his assertion that, because evidence of
 
 *289
 
 prior bad acts was introduced, he is automatically entitled to a new trial.
 

 Initially, we note that when this exhibit, State’s exhibit 82, was introduced into evidence, the following occurred:
 

 “[Prosecutor]: Your Honor, at this time we move to admit State’s Exhibit 82.
 

 “The Court: Okay.
 

 “[Defense counsel]: May we approach the witness?
 

 “The Court: Yes, go ahead. For future reference, you don’t have to ask permission to approach the witness.
 

 “[Defense counsel]: All right.
 

 “([Defense counsel] examines exhibit.)
 

 “[Defense counsel]: No objection, Your Honor.
 

 “The Court: It will be admitted.”
 

 (R. 928.) There was no objection to the admission of this exhibit; therefore, we are limited to reviewing this issue for plain error. See Rule 45A, Ala.R.App.P.
 

 The record shows that State’s exhibit 82 contains several different documents — a time card, a two-page letter to the Alabama Public Safety Department, a fingerprint-examination request form, a copy of a fingerprint card for Annette, and a copy of a fingerprint card that bears the name “Rick Allen Belisle.” On the front of Belisle’s card in the space designated for “Date Arrested or Received” is “01-02-99.” In the space designated for'charge is “Harassment (DV).” The card also contains Belisle’s vital statistics. There is no indication that any law-enforcement agency executed the card. On the front of the card is a space marked: “Signature of Official Taking Fingerprint.” There is no indication that a police officer took the fingerprints. All of the spaces on the back of the card are blank except for Belisle’s address and the date of offense “01-02-99.” This fingerprint card was introduced along with Annette’s Belisle’s fingerprint card for comparison with possible prints from Moore’s time card at the Kwik Mart. There was no mention of any specifics surrounding the making of the fingerprint card; i.e., why the fingerprints were taken or who took the fingerprints. In fact, no mention was made when the card was introduced, that the fingerprint card was part of this exhibit much less what was written on the card. No predicate or foundation was laid for the admittance of the fingerprint card. There were indirect references to fingerprint cards by both the prosecution and defense counsel, although Belisle’s card was never specifically identified. Also, this exhibit was one of 115 exhibits introduced by the State.
 

 Belisle argues that the Alabama Supreme Court’s holding in
 
 Johnson
 
 mandates that the judgment in this case be reversed because of the erroneous admission of the fingerprint card that indicated that he had previously been charged with harassment.
 

 In distinguishing the holding in
 
 Johnson,
 
 this Court in
 
 Thomas v. State,
 
 824 So.2d 1 (Ala.Crim.App.1999), overruled on other grounds,
 
 Ex parte Carter,
 
 889 So.2d 528 (Ala.2004), gave an in-depth discussion of the law on this issue. We quote extensively from that opinion, because we believe the facts of this case are similar to those presented to this Court in
 
 Thomas:
 

 “In asserting plain error, Thomas relies on
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986),
 
 rev’g
 
 507 So.2d 1337 (Ala.Cr.App.1985), wherein the Alabama Supreme Court reversed Johnson’s capital murder conviction and death sentence on its finding that the admission into evidence of a fingerprint card of Johnson’s was plain error. In addition to showing Johnson’s full name, his two aliases (which were ‘simply versions of the principal name shown’), and the date the prints were taken, the information
 
 *290
 
 on the front of the ‘police fingerprint card’ included the following: ‘ “At the left of one of the blanks on the card are the letters ‘FBI’ and thereafter are printed the numerals and letter constituting the FBI identification number. To the left of another blank are the words ‘Police No.’ and following that are a typed number and five handwritten numbers.’” 507 So.2d at 1354. The Alabama Supreme Court found that the front of the card ‘contained information which
 
 dearly revealed
 
 the defendant’s
 
 past contacts with law enforcement agencies,’
 
 from which ‘the jury could have readily inferred,
 
 at a minimum,
 
 that he had been arrested in the past.’ 507 So.2d at 1357 (emphasis added). In considering
 
 Johnson,
 
 we also find significant the testimony of the officer who took Johnson’s prints and whose signature was on the front of the card: ‘[0]ne of [his] duties at the city jail was to take inked fingerprints,’ and Johnson’s ‘prints were made in the ordinary course of business of fingerprinting people at the Birmingham City Jail and were kept by the Birmingham Police Department in its Identification Bureau.’ 507 So.2d at 1341.
 

 “In reversing the Court of Criminal Appeals’ holding that the admission of Johnson’s fingerprint record did not rise to plain error, the Alabama Supreme Court cited
 
 Brown v. State,
 
 369 So.2d 881 (Ala.Cr.App.1979). In
 
 Brown,
 
 the court reversed the judgment, based on the (preserved) trial court’s error in admitting into evidence the appellant’s fingerprint card. The court held: ‘The extraneous information contained on the exhibit reasonably implied the existence of a prior criminal record of the appellant.’
 
 Id.
 
 at 884. The information included the arrest date (one year before the offense for which he was on trial), five aliases, and an FBI identification number. We find it also significant that the officer who took the appellant’s prints testified that ‘the general procedure of being admitted to jail involved being fingerprinted’ and that the appellant ‘had been admitted to jail and fingerprinted “about a year or two ago.” ’
 
 Id.
 
 at 883.
 

 “In addition, in reversing this court’s determination that there was no plain error, the Court in
 
 Ex parte Johnson
 
 distinguished the circumstances before it from those in
 
 United States v. Richardson,
 
 562 F.2d 476 (7th Cir.1977), upon which this court had relied. In
 
 Richardson,
 
 the question was whether plain error had occurred upon the receipt into evidence of a photograph of Richardson’s ‘FBI file card of his palm print, which contains a blank printed form, the reverse side captioned, “BOB TURNER, Sheriff-OKLAHOMA COUNTY BUREAU OF IDENTIFICATION,” and which includes spaces for identification information such as “FBI No.,” “Date of Arrest,” “Crime,” and “Sentence.” ’
 
 Id.
 
 at 478. After recognizing that ‘[t]he plain error rule is of particular significance here because the error complained of could have been easily corrected at the time of the admission of the evidence by covering the extraneous information on the exhibits,’
 
 id.,
 
 the court continued,
 

 “ ‘[T]he material on the reverse side of the card implies that Richardson had past contacts with a law enforcement agency. From this the jury could infer, at a minimum, that he had been arrested in the past. Evidence that manifests such an implication of past criminal behavior could have prejudiced Richardson and would, if presented independently, have been inadmissible because Richardson did not put his character into issue at trial.
 

 
 *291
 
 “ ‘While the submission of the reverse side of the palm print card to the jury possibly could have been somewhat prejudicial to Richardson, we do not think that the possible prejudice engendered was severe enough to constitute plain error. [Tjhere was no emphasis put on the potentially prejudicial aspect of the exhibit. No testimony accompanied the admission of the exhibit that might have focused the jury’s attention on its potentially prejudicial aspects ..., nor did the judge unduly focus the jury’s attention on the exhibit by engaging in a discussion about how the photos should be covered in front of the jury....
 
 More important, none of the identifying information such as “FBI No., ” “Date of Arrest,
 
 ”
 
 “Crime,
 
 ” or
 
 “Sentence" was filled in, and the nature of the defendant’s prior contact with Oklahoma law enforcement officials was oblique. Accordingly, we believe the possibility of prejudice that resulted from submission of the reverse side of the palm print card ivas remote.
 
 Moreover, any possible prejudice easily could have been prevented by defense counsel if he had objected to the submission at trial. In view of the above, we hold that the submission of the card was not plain error affecting substantial rights of the defendant within the meaning of Rule 52 of the Federal Rules of Criminal Procedure.’
 

 “Id.
 
 at 479, quoted in
 
 Ex parte Johnson,
 
 507 So.2d at 1356-57 (emphasis added in
 
 Johnson).
 

 “In applying this caselaw to the circumstances before us, we recognize, ‘Each case of alleged error in the admission of a fingerprint record taken pursuant to another criminal offense and prior to the charge for which the accused is presently on trial must be judged upon its own merits.’
 
 Buchannon v. State,
 
 554 So.2d 477, 480 (Ala.Cr.App.) (quoting
 
 Woodson v. State,
 
 405 So.2d 967, 969 (Ala.Cr.App.),
 
 cert. denied,
 
 405 So.2d 969 (Ala.1981)),
 
 cert. denied,
 
 554 So.2d 494 (Ala.1989),
 
 overruled on other ground by Pardue v. State,
 
 571 So.2d 333 (Ala.1990). We start with the premise that ‘[t]he mere existence of recorded fingerprints does not per se imply the existence of a criminal record.’
 
 Brown,
 
 369 So.2d at 884.
 

 “The circumstances of this case are clearly not as compelling as those of
 
 Johnson
 
 and
 
 Brown.
 
 Unlike the card in
 
 Johnson,
 
 which showed six separate numbers designated as ‘Police No.,’ Thomas’s card did not even have an information block designated ‘Police No.’ Unlike the cards in
 
 Johnson
 
 and
 
 Brown,
 
 Thomas’s card did not show a number in the block designated for the ‘FBI’ number. The only completed block on Thomas’s card calling for a number was the one designated ‘YOUR NO. OCA.’ However; the evidence offers no explanation as to any significance of that number, and we find none to be obvious. Thomas asserts that two handwritten numbers at the top of the card could have readily been inferred as signifying police numbers. We disagree. One was the same number provided in the block TOUR NO.
 
 OCA.’
 
 The other was the case number assigned the pieces of evidence in this case that were processed through the Alabama Department of Forensic Sciences. Thus, Thomas’s card did not contain numbers that could have been interpreted to indicate several previous contacts with law enforcement. We reject Thomas’s assertion that his card ‘contained the same type of police numbers condemned in
 
 Johnson.’
 
 (Appellant’s Brief, p. 35.) In addition, unlike the card in
 
 Brown,
 
 which indicated
 
 *292
 
 five aliases, Thomas’s card showed only one, ‘Tank,’ and it signified nothing more than a nickname. We are further impressed by the absence here of any prejudicial testimony regarding where, why, and under what circumstances Thomas’s prints were taken. In both
 
 Johnson
 
 and
 
 Broum,
 
 an officer testified as to having taken the prints in the jail, and the officer in
 
 Brown
 
 specifically testified that the appellant had been admitted to the jail. The testimony in Thomas’s trial was devoid of any implication that Thomas’s prints had been taken during a prior arrest. Moreover, Thomas’s card denominated the taker of the prints as an ‘OFFICIAL,’ not a police officer. The information on the card would not even support an inference that a law enforcement officer had taken his prints.
 

 “Rather, we find that the circumstances before us are somewhat more innocuous than those of
 
 Richardson.
 
 In
 
 Richardson,
 
 the printed form was captioned, ‘BOB TURNER, Sheriff-OKLAHOMA COUNTY BUREAU OF IDENTIFICATION.’ The court in
 
 Richardson
 
 found that this caption and the empty blocks asking for the FBI number, date of arrest, crime, and sentence implied that Richardson had had past contacts with a law enforcement agency. Here, the circumstances do not support such an implication as strongly: Thomas’s card was not clearly designated to be that procured by a law enforcement agency. In so finding, we also find that the evidence did not indicate, nor is it ‘obvious,’ as Thomas argues, that ‘SO MOBILE, AL’ in the block ‘CONTRIBUTOR’ is the designated abbreviation for ‘Sheriffs Office.’
 

 “However, assuming, arguendo, that the information asked for on Thomas’s card (but not necessarily supplied in this case) implies that such a card is used by a law enforcement agency, which, in turn, implies that Thomas had past contact with a law enforcement agency, and that such contact implies that he had been arrested in the past, we find that the circumstances before us support the conclusion reached by the court in
 
 Richardson:
 
 ‘While the submission of the ... card to the jury possibly could have been somewhat prejudicial to [the defendant], we do not think that the possible prejudice engendered was severe enough to constitute plain error.’ 562 F.2d at 478.
 
 Compare Woodson v. State,
 
 405 So.2d 967, 968-69 (Ala.Cr.App.) (the trial court did not err in admitting the defendant’s fingerprint card, which did not indicate that it was in any way connected with a criminal charge against the defendant other than the fact that it was a fingerprint record made by the police department; ‘The date (even if it is before the offense involved in the trial) and the place of taking (the police department) need not be eliminated from the fingerprint record before the card is introduced into evidence.’),
 
 cert. denied,
 
 405 So.2d 969 (Ala.1981). As in
 
 Richardson,
 
 no testimony or attention by the trial court emphasized any alleged potential prejudicial aspect of the card. More importantly, like the card in
 
 Richardson,
 
 Thomas’s card contained no identification information — such as a specific crime, sentence, or FBI number. (As is apparent from the emphasis added by the
 
 Johnson
 
 court in quoting
 
 Richardson,
 
 507 So.2d at 1357, the Alabama Supreme Court also noticed that no such identifying information had been filled in on the card in
 
 Richardson.)
 

 “In an effort to distinguish his card from the card in
 
 Richardson,
 
 which did not have a date for the blank ‘DATE ARRESTED,’ Thomas asserts that his
 
 *293
 
 card ‘explicitly stated’ that he was arrested on September 17, 1992, the date in the block ‘DATE ARRESTED OR RECEIVED.’ We find that, by the ambiguity of the caption for the block, the nature of Thomas’s presumed contact with law enforcement authorities was ‘oblique.’
 
 See Richardson. Cf. McNair v. State,
 
 653 So.2d 320, 341 (Ala.Cr.App.1992) (in holding that the prosecutor did not commit plain error by commenting in closing argument that McNair had stated in an extrajudicial statement that he had been in ‘a little bit [of trouble] down in Florida,’ the court noted that, because of its brevity and vagueness, the comment did not ‘lead to a clear inference of past criminal activity’),
 
 aff'd,
 
 653 So.2d 353 (Ala.1994), cert.
 
 denied,
 
 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). We find that
 
 Johnson’s
 
 critical holding does not apply to the circumstances here; Thomas’s card did not contain information that
 
 ‘clearly revealed
 
 the defendant’s past contacts with law enforcement agencies,’ from which ‘the jury could have readily inferred,
 
 at a minimum,
 
 that he had been
 
 arrested
 
 in the past.’ 507 So.2d at 1357 (emphasis added). Compare also
 
 Buchannon v. State,
 
 554 So.2d at 480 (harmless error to admit fingerprint card where it showed Buchannon’s FBI and SID numbers, the signature of the person who made the prints, and the date the prints were taken, which was 10 weeks before the commission of the offense for which he was on trial, and where the word ‘Charge’ remained visible, although the prosecution had tried to obscure the arrest information with small pieces of paper taped to the card, ‘so that the piece of paper appear[ed] to (and obviously [did]) cover information related thereto’).
 

 “Any error here was not plain error. It was not ‘clear’ or ‘obvious’ under the law.
 
 See [United States v.] Olano[,
 
 507 U.S. 725 (1993) ]. This finding is buttressed by the fact that defense counsel apparently did not notice any allegedly potentially prejudicial information on the card when he viewed it, as disclosed by the record. (In so finding, we are not implying that defense counsel waived any error by failing to object.
 
 See Ex parte Johnson,
 
 507 So.2d at 1358 (waiver cannot be implied from an assumption that defense counsel was fully aware of the contents of the exhibit where the record offers the ‘equally compelling inference’ that counsel simply did not recognize the error).) Moreover, the prosecutor never attempted to imply that Thomas in fact had a criminal record.
 

 “In addition, Thomas has failed to meet his burden of making a specific showing of prejudice that would satisfy the ‘affecting substantial rights’ prong of
 
 Olano.
 
 Looking at all the circumstances, we adopt the finding of the court in
 
 Richardson:
 
 we believe the possibility of prejudice that resulted from the admission of the fingerprint card was remote. Moreover, the testimony at trial contained references, properly admitted into evidence, to Thomas’s illegal drug activity.
 
 See Ex parte Dill,
 
 600 So.2d 372, 373 (Ala.1992) (the Alabama Supreme Court, in finding that the reference by ‘an officer of considerable law enforcement experience’ to his attempt to locate the defendant ‘through [the defendant’s] parole officer’ did not constitute plain error, considered the fact that the record contained repeated references, properly in evidence, to drug sales and other illegal activity on the part of the defendant),
 
 cert. denied,
 
 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). It is inconceivable that a jury could have been influenced, under the circumstances here, to convict
 
 *294
 
 Thomas of crimes of the magnitude charged here because of an oblique reference to a prior criminal record. ‘Whether the [state] could have met its burden of showing the absence of prejudice, under [harmless error], if [Thomas] had not forfeited [his] claim of error, is not at issue here. This is a plain-error case, and it is [Thomas] who must persuade the appellate court that the [plain error] was prejudicial.’
 
 Olano,
 
 507 U.S. at 741, 113 S.Ct. 1770. Even assuming the alleged error was plain and that it affected Thomas’s substantial rights, it does not meet the final requirement of
 
 Olano.
 
 Under the circumstances here, such an error would not have seriously affected the fairness, integrity, or public reputation of the judicial proceedings.
 
 See also Johnson v. United States,
 
 520 U.S. 461, 117 S.Ct. 1544 (1997).
 

 “Finally, we emphasize that we have reviewed this claim under ‘the stringent requirements applicable to the plain error rule.’
 
 Ex parte Dill,
 
 600 So.2d at 373 (in finding that a witness’s reference to his attempt to locate the defendant ‘through [the defendant’s] parole officer’ did not constitute plain error, the Alabama Supreme Court noted that its conclusion was supported only by its consideration of ‘the stringent requirements applicable to the plain error rule’ and ‘the particular facts of this case,’ including the facts that the reference to the defendant’s parole officer was incidental and not the main point of the witness’s testimony, that the reference was not repeated or highlighted in later testimony, and that the record contained repeated references, properly in evidence, to drug sales and other illegal activity on the part of the defendant). As the court in
 
 Richardson
 
 stated, ‘The plain error rule is of particular significance here because the error complained of could have been easily corrected at the time of the admission of the evidence by covering the extraneous information on the exhibits.’
 
 Id.
 
 at 478.
 
 See also
 
 Plain-Error Standard of Review,
 
 supra.”
 

 824 So.2d at 16-21 (footnote omitted).
 

 The
 
 Johnson
 
 Court did not hold that the admission of a fingerprint card containing extraneous information would always constitute plain error or could never be harmless. Clearly, the facts in this case are far less egregious than those presented to the court in
 
 Johnson.
 
 As we noted in
 
 Thomas,
 
 the facts of each case must be individually scrutinized. Based on the unique facts presented in this case, we cannot say that the admittance of Belisle’s fingerprint card was plain error. Even if the jurors examined the exhibit, “[i]t is inconceivable that a jury could have been influenced, under the circumstances here, to convict [the appellant] of crimes of the magnitude charged here because of an oblique reference to a prior criminal record.”
 
 Thomas,
 
 824 So.2d at 20. As we further noted in Thomas: “ ‘The plain error rule is of particular significance here because the error complained of could have been easily corrected at the time of the admission of the evidence by covering the extraneous information on the exhibit! ].’ ”
 
 Thomas,
 
 824 So.2d at 21, quoting
 
 United States v. Richardson,
 
 562 F.2d 476, 478 (7th Cir.1977). Like the court in
 
 Thomas,
 
 we hold that there was no error that affected Belisle’s substantial rights. See Rule 45A, Ala.R.App.P.
 

 XIII.
 

 Belisle further argues that the State violated
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by withholding impeachment evidence relevant to Annette’s credibility. Specifically, he asserts that the State failed to disclose the terms of its original plea agreement with Annette, which agree
 
 *295
 
 ment included a document that contained a rendition of her expected testimony.
 

 “In
 
 Brady [v. Maryland],
 
 373 U.S. [83] at 87, 83 S.Ct. [1194] at 1196-97 [ (1963) ], the Supreme. Court held that ‘the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.’ A
 
 Brady
 
 violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial.
 
 Stano v. Dugger,
 
 901 F.2d 898, 899 (11th Cir.1990);
 
 Delap v. Dugger,
 
 890 F.2d 285 (11th Cir.1989);
 
 United States v. Blasco,
 
 702 F.2d 1315, 1327 (11th Cir.),
 
 cert. denied,
 
 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983);
 
 Ex parte Kennedy,
 
 472 So.2d 1106, 1110 (Ala.),
 
 cert. denied,
 
 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in
 
 United States v. Bagley,
 
 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)(plurality opinion by Blackmun, J.), defined the standard of materiality required to show a
 
 Brady
 
 violation as follows: ‘The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A “reasonable probability” is a probability sufficient to undermine confidence in the outcome.’
 
 See also Pennsylvania v. Ritchie,
 
 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987);
 
 Stano v. Dugger,
 
 901 F.2d at 899;
 
 Delap v. Dugger,
 
 890 F.2d at 299;
 
 Coral v. State,
 
 628 So.2d 954 (Ala.Cr.App.1992);
 
 Thompson v. State,
 
 581 So.2d 1216 (Ala.Cr.App.1991),
 
 cert. denied,
 
 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
 

 “The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes.
 
 United States v. Bagley; Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972);
 
 Ex parte Womack[,
 
 435 So.2d 766 (Ala.1983) ]. “When the “reliability of a given witness may well be determinative of guilt or innocence,” nondisclosure of evidence affecting credibility falls within the general rule.’
 
 Giglio,
 
 405 U.S. at 154, 92 S.Ct. at 766 (quoting
 
 Napue v. Illinois,
 
 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state’s witness.”
 

 Williams v. State,
 
 710 So.2d 1276, 1296-97 (Ala.Crim.App.1996).
 

 “In
 
 United States v. Agurs,
 
 427 U.S. 97, 103-04, 96 S.Ct. 2392, 2397-98, 49 L.Ed.2d 342 (1976), the Court stated that the degree of materiality required to overturn a conviction under
 
 Brady [v. Maryland,
 
 373 U.S. 83 (1963) ], supra, varies with the circumstances of the particular cases. Where a-defendant makes a request for specific
 
 Brady
 
 material and the government fails to disclose the materials requested, a court will reverse whenever there is reason to believe that the nondisclosure ‘might have affected the outcome of the trial.’ 427 U.S. at 104, 96 S.Ct. at 2398.”
 

 Dixon v. State,
 
 536 So.2d 959, 964 (Ala.Crim.App.1988).
 

 The record shows that in April 2002 Annette executed a plea agreement with the previous prosecutor; pursuant to that agreement, in exchange for her truthful testimony at her husband’s trial, she would plead guilty to the lesser-included
 
 *296
 
 offense of felony murder and the State would recommend a sentence of 15 years’ imprisonment. To memorialize this agreement the State executed a document that contained a synopsis of her June 14, 1999, statement to Investigator Bill Strickland. It was clear that the plea agreement was conditioned on her testifying truthfully in Belisle’s trial. As a result of that plea agreement, Annette pleaded guilty to felony murder. However, she subsequently moved to withdraw that plea, the motion was granted, and the plea was set aside. Annette’s withdrawal of her plea voided the previous plea agreement, and the original charges were reinstated.
 

 When a new prosecutor was appointed, he executed a new plea agreement with Annette. In this plea agreement, the State agreed that, if Annette pleaded guilty to felony murder, the State would recommend a 20-year sentence if she testified truthfully at her husband’s trial. No document was executed with this agreement.
 

 At trial, Annette testified that she had looked at a “list” before she testified. Defense counsel questioned her about the “list” and discovered that her first plea agreement contained a synopsis of her expected testimony that had been compiled using her last statement to police. This synopsis had not been disclosed to defense counsel. Defense counsel moved to dismiss the charges based on prosecutorial misconduct and moved for a mistrial. After some discussion, the circuit court denied the motion for a mistrial, called a recess, and allowed the defense to question Annette extensively concerning the document. Annette was thoroughly cross-examined for 353 pages of the transcript.
 

 Moreover, the “list” was a shortened rendition of the last statement that Annette had given to police. There is no indication that the defense had not been furnished with a copy of this statement to police. In fact, it appears that the opposite is true. It is also clear that the defense was fully aware that Annette had executed a plea agreement to secure her testimony at Belisle’s trial.
 

 Here, the document that was not disclosed to the defense was based on the first plea agreement that the State had with Annette, which was rendered void when she withdrew that plea. Also, both of Annette’s plea agreements were based on her testifying truthfully at her husband’s trial. There is no indication, as Belisle argues, that the prosecutor had compiled a transcript for Annette to follow at trial. Nor is there any indication that the defense was not given a copy of Annette’s statement to police. Annette was thoroughly cross-examined about her plea agreement and repeatedly said that the State had told her to testify truthfully. Under the facts of this case, there is no indication that the late disclosure of the document affected the outcome of the trial. See
 
 Dixon.
 
 Accordingly, we find no reversible error.
 

 XIV.
 

 Belisle further argues that the circuit court erred in admitting what he says was unreliable identification testimony that was the result of an unduly suggestive photographic display of a tattoo. Specifically, he argues that Wallace Scott’s in-court identification was based on an imper-missibly suggestive pretrial showup and should have been excluded, that Scott’s initial identification of the tattoo was vague, and that the delay between his identification and his in-court identification exacerbated the harm caused by the im-permissibly suggestive identification.
 

 The record shows that State’s witness Scott testified that he lived in Albertville and that, at the time of the murder, he
 
 *297
 
 went to the Kwik Mart convenience store almost every night on his way to work at 11:00 p.m. He said that the night before the murder, he stopped at the store and he saw a couple in the store standing by the counter talking with the store clerk. It was a man and a women. The man, he said, was not wearing a shirt and had a big tattoo across his back. The tattoo included script in “Old English” and a hurricane. He said that he believed that he could identify the tattoo. The State then moved that Belisle remove his shirt so that the witness could see his tattoo. Scott identified Belisle’s tattoo as the same as the one he saw on the individual in the store the night before the murder. He said that he described the tattoo to police. He told Detective Stanfield that the tattoo was big and the lettering looked like “Old English.” He said that after he described the tattoo Detective Stanfield showed him a picture of Belisle’s tattoo. He testified that he got a “pretty good look” at the two individuals and a good look at the tattoo.
 

 Alabama has never had occasion to address whether the identification of a tattoo is unduly suggestive if the identifying witness is shown only one picture of a tattoo. The State relies on the case of
 
 State v. Newcomb,
 
 934 S.W.2d 608 (Mo.Ct.App.1996), to support its argument that no error occurred.
 

 The
 
 Newcomb
 
 Court stated:
 

 “Many cases in our courts and in the Supreme Court of the United States have dealt with photographic identification, but in all of those that have come to our attention the identification has been of the face or general appearance of the suspect. This is the only one we have seen in which the identification shown in the pictures was of body marks. By analogy to the facial identification cases, we conclude that the questions of undue suggestiveness and ensuing reliability are primarily matters for the trial court to decide.
 

 [[Image here]]
 

 “The defendant recognizes his burden of demonstrating both impermissible suggestiveness and unreliability.
 
 State v. Hornbuckle,
 
 769 S.W.2d 89, 93 (Mo. banc 1989). He rather assumes that the display of pictures showing only the defendant’s markings was suggestive, and argues that ‘... it was simply not necessary that Detective Brown show the victim pictures of appellant’s tattoos without including photographs of similar tattoos on other men ... ’ This suggestion might have struck the trial judge as totally impracticable, as it does us.
 
 Cf. Neil v. Biggers,
 
 409 U.S. 188, 195, 93 S.Ct. 375, 380, 34 L.Ed.2d 401 (1972), (indicating that a one-person showup, rather than a lineup, might be appropriate if the police could not find people sufficiently similar to a suspect to put in a lineup). The trial judge might consider it extremely unlikely that similar tattoos could be found. If tattoos were displayed which were quite different, then this kind of display would have potential for suggestiveness.
 

 [[Image here]]
 

 “Based on the foregoing, the trial judge was wholly justified in allowing the jury to hear the victim’s testimony in which she identified the tattoos.”
 

 934 S.W.2d at 610-11. Under the circumstances presented in this case we agree with the Missouri Court of Appeals that the pretrial identification of the unique tattoo was not unduly suggestive.
 

 Moreover, even if we were to conclude that the pretrial identification was unduly suggestive: “When an in-court identification is shown to have a basis independent of any pretrial identification or confrontation, it is properly admitted into evidence.”
 
 Whitt v. State,
 
 733 So.2d 463,
 
 *298
 
 472 (Ala.Crim.App.1998). Scott’s testimony showed that he had an independent basis for identifying the tattoo in court.
 

 Finally, Belisle said in his statement to police that he was in the store on the day before the murder. Defense counsel also mentioned this in his closing argument. Accordingly, if any error did occur in the identification testimony, we are confident that it was harmless beyond a reasonable doubt. See
 
 Chapman v. California,
 
 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
 

 XV.
 

 Belisle next argues that he was denied his right to cross-examine Annette about prior uncharged bad acts. Specifically, he argues that the circuit court should have allowed him to cross-examine Annette about having killed her child and having watched her uncle kill a man.
 

 The circuit court specifically disallowed this testimony based on Rule 608(b), Ala.R.Evid. This rule states:
 

 “Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness’s credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.”
 

 The Alabama Rules of Evidence are based on the Federal Rules of Evidence. When adopting this rule, however, the drafters specifically rejected Rule 608(b)(1), Fed.R.Evid., which permits inquiry on cross-examination concerning prior uncharged bad acts.
 

 Under Alabama law, Belisle had no right to cross-examine Annette about specific uncharged bad acts. The circuit court’s ruling was consistent with Rule 608(b), Ala.R.Evid.
 

 Also, all this evidence was presented during the testimony of several defense witnesses. Kitty Hyatt testified that Annette told her that her uncle had killed seven people and that she saw him kill one person and that he taught her how to clean up after she had done something wrong. She also said that Annette told her that she had lied on the witness stand when she testified at her uncle’s trial. Valeire Wheeler also testified that Annette told her that she had killed her baby by putting a plastic bag over his head. Thus, all of the challenged excluded evidence was presented at trial.
 

 XVI.
 

 Belisle next argues, by merely citing a string cite of page numbers in the record, that the circuit court erred in allowing numerous instances of hearsay evidence to be received into evidence.
 

 We have examined the cited portions of the record and note that no hearsay objections were made at the time of the challenged testimony. Accordingly, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 “ ‘Hearsay1 is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c), Ala.R.Evid.
 

 The majority of the cited instances did not constitute hearsay because the testimony was not elicited to prove the truth of the matter asserted. In other instances, the testimony was merely cumulative of
 
 *299
 
 other lawfully admitted testimony and its admission was harmless beyond a reasonable doubt. See
 
 Chapman v. California.
 
 Any error in the admission of hearsay testimony was harmless beyond a reasonable doubt when the testimony is cumulative to other lawfully admitted testimony.
 
 McNair v. State,
 
 706 So.2d 828, 851 (Ala.Crim.App.1997). We find no plain error in the admission of the challenged testimonies.
 

 XVII.
 

 Belisle next argues that the circuit court erred in admitting numerous photographs he says were prejudicial. He further asserts that the court erroneously forced Belisle to lift up his shirt to allow a State’s witness to see the tattoo on his back.
 

 First, the appellate courts of this State have repeatedly held that photographs are admissible, even though they are inflammatory, prejudicial, or cumulative of other evidence. See
 
 Ex parte Siebert,
 
 555 So.2d 780, 784 (Ala.1989);
 
 Ferguson v. State,
 
 814 So.2d 925, 944 (Ala.Crim.App.2000);
 
 Ward v. State,
 
 814 So.2d 899 (Ala.Crim.App.2000);
 
 Jackson v. State,
 
 791 So.2d 979, 1016 (Ala.Crim.App.2000);
 
 Williams v. State,
 
 506 So.2d 368, 371 (Ala.Crim.App.1986);
 
 Magwood v. State,
 
 494 So.2d 124, 141 (Ala.Crim.App.1985);
 
 Walker v. State,
 
 416 So.2d 1083, 1090 (Ala.Crim.App.1982).
 

 Second, we find no error in the court’s asking Belisle to lift up his shirt so that a State witness could see the tattoo on his back. In
 
 Spangler v. State,
 
 711 So.2d 1125 (Ala.Crim.App.1997), we stated:
 

 “ ‘The distinction between a testimonial and nontestimonial communication gives the government a great deal of freedom in conducting an investigation. The government may, for example, compel a person to reenact crime; shave his beard or mustache; try on clothing; dye her hair; demonstrate speech or other physical characteristics; furnish handwriting samples; hair samples, or fingerprints, have her teeth and gums examined; or take a blood-alcohol, breathalyzer, or urine test.’ ”
 

 711 So.2d at 1127, quoting
 
 Twenty-fifth Annual Review of Criminal Procedure,
 
 84 Geo. L.J. 1115, 1212-13 (1996) (footnote omitted).
 

 “In criminal prosecutions, the court has required a defendant to exhibit his physical make-up: to put on a shirt,
 
 State v. Morgan,
 
 La., 333 So.2d 642 (1976); to exhibit a scar,
 
 State v. Anthony,
 
 La., 332 So.2d 214 (1976); to exhibit a tattoo,
 
 State v. Wilson,
 
 La., 329 So.2d 680 (1976); to show how he opens a cigarette package,
 
 State v. O’Conner,
 
 La., 320 So.2d 188 (1975); to show a bruise,
 
 State v. Washington,
 
 La., 294 So.2d 794 (1974); to stand and identify himself,
 
 State v. Jones,
 
 261 La. 422, 259 So.2d 899 (1972); to give a handwriting sample,
 
 State v. Thompson,
 
 256 La. 934, 240 So.2d 712 (1970); to give blood samples,
 
 State v. Dugas, 252
 
 La. 345, 211 So.2d 285 (1968), cert. denied 393 U.S. 1048, 89 S.Ct. 679, 21 L.Ed.2d 691 [ (1969) ]; and to allow his height to be measured,
 
 State v. Roy,
 
 220 La. 1017, 58 So.2d 323 (1952).”
 

 State v. Barnes,
 
 365 So.2d 1282, 1285 (La.1978).
 

 Last, Belisle argues that there were less intrusive ways to identify Beli-sle’s tattoo; therefore, the State should have accepted his stipulation that Belisle had a tattoo of a hurricane on his back. “In Alabama, a party is not required to accept his adversary’s stipulation, but may insist on proving the fact.”
 
 Duncan v. State,
 
 624 So.2d 1084, 1086 (Ala.Crim.App.1993). For the foregoing reasons, we find no error.
 

 
 *300
 
 XVIII.
 

 Belisle argues that the circuit court erred in denying his motion for a mistrial after Detective J.T. Cartee indicated that Belisle had asked for an attorney when he was questioned by police. He argues that this
 
 Doyle v. Ohio,
 
 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), violation warrants a new trial.
 

 The record shows that during Cartee’s testimony, Cartee was asked to testify as to what Belisle told police during his interview in Missouri on June 7, 1999. The following occurred:
 

 “[Prosecutor]: Hold on, if you don’t mind. If you will, skip down and begin I think two sentences before the end of that paragraph. He said that he was home.
 

 “[Cartee]: Okay. He said that he was home on the night of the murder. He said that his daughter got up around 12:45 a.m. and she can confirm this. Notation: 9:19 p.m. Rick admitted to his — admitted helping his wife open the safe once. He was confronted with what Annette had said about them not leaving together. He said that he was about 30 yards ahead of her, and he had thrown rocks at her. 9:26 p.m. Rick asked for an attor—
 

 “[Prosecutor]: Hold on. Okay, let me stop you there. Now, earlier in the statement, did he talk about he and Annette walking home.”
 

 (R. 1576-77.) It was not until three more witnesses had testified that Belisle moved for a mistrial based on Cartee’s comments. The court took the matter under advisement and researched the issue. Relying on the cases of
 
 West v. State,
 
 623 So.2d 380 (Ala.Crim.App.1993), and
 
 United States v. Miller,
 
 255 F.3d 1282 (11th Cir.2001), the court denied the motion for a mistrial and gave the jury the following thorough curative instruction:
 

 “Ladies and gentlemen, yesterday afternoon Chief Detective J.T. Butch Car-tee testified in the State’s case-in-chief. During part of his testimony, in answering question, he casually made mention that the defendant asked to talk to an attorney. Now, I’m telling you, ladies and gentlemen, that that is a constitutional right to which the defendant has, as do I or any one of you. Just like we have the constitutional right to freedom of speech or we have a constitutional right to worship as we desire to worship. And the exercising of a constitutional right is not to be considered as evidence in this case. The fact that he may have asked to speak to an attorney, I instruct you that it is not evidence in this case and cannot be considered as evidence of his guilt. It cannot be considered evidence in any way whatsoever. Now, will you ladies and gentlemen follow my instruction and not consider that statement and not consider that as a fact in your deliberations and your discussions?
 

 “Jury: Yes, sir.”
 

 (R. 1773-74.)
 
 [6]
 

 We have held that
 

 
 *301
 
 “‘Under
 
 Doyle v. Ohio,
 
 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the prosecution may not use the post-arrest,
 
 post-Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), silence of a defendant as evidence of his guilt.
 

 “ ‘ . [W]hile it is true that the
 
 Miranda
 
 warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.”
 

 “
 
 ‘Doyle,
 
 426 U.S. at 618, 96 S.Ct. at 2245.’
 

 “Burell v. State,
 
 680 So.2d 975, 980 (Ala.Crim.App.1996).
 

 “ ‘The receipt into evidence of testimony concerning an accused’s post-
 
 Miranda
 
 exercise of the constitutional right to remain silent is itself a violation of the accused’s constitutional right to remain silent.
 
 Doyle v. Ohio,
 
 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976);
 
 Houston v. State,
 
 354 So.2d 825 (Ala.Cr.App.1977), cert. denied, 354 So.2d 829 (Ala.1978). The receipt of this evidence, may be harmless. “An error involving an infringement of a defendant’s constitutional right
 
 can be held harmless only if the court is able to declare beyond a reasonable doubt that the error was harmless.” Houston,
 
 354 So.2d at 828. (Emphasis added.)’
 

 “Harris v. State,
 
 611 So.2d 1159, 1160-61 (Ala.Crim.App.1992). In
 
 Mixon v. State,
 
 596 So.2d 605, 608 (Ala.Crim.App.1991), this court held that, for a
 
 Doyle
 
 violation to be harmless,
 

 “‘the State should prove 1) that the evidence of [the appellant’s] guilt was overwhelming and that his defense was transparently frivolous; 2) that the prosecution made only a single reference to [the appellant’s] silence and this reference was neither repeated nor linked with [the appellant’s] exculpatory testimony; and 3) that the trial court properly instructed the jury upon sustaining the defense’s objections.
 
 Houston v. State, supra,
 
 354 So.2d at 829 (citing
 
 Chapman v. United States,
 
 547 F.2d 1240, 1250 (5th Cir.),
 
 cert. denied,
 
 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), and
 
 Adkins v. State,
 
 265 Ala. 666, 93 So.2d 522 (1957)).’
 

 “Although
 
 Mixon
 
 purports to set forth a three-pronged test for determining whether a
 
 Doyle
 
 violation is harmless, that standard is not appropriate in every case. The facts surrounding
 
 Doyle
 
 violations vary widely and do not lend themselves to being analyzed using the narrowly tailored standard set forth in
 
 Mixon
 
 for determining whether they are harmless. Rather, the determination of whether a
 
 Doyle
 
 violation is harmless should be made on a case-by-case basis under the specific facts of each case. Accordingly, to the extent our decision in
 
 Mixon
 
 purports to set forth the only standard for determining whether a
 
 Doyle
 
 violation is harmless, it is hereby expressly overruled.
 

 “In this case, the jury apparently believed the version of the facts the appellant presented at trial because it acquitted him of all charges except third-degree escape, which he specifically admitted during his trial testimony. The evidence about the appellant’s guilt of
 
 *302
 
 third-degree escape was undisputed and overwhelming. Therefore, under these specific circumstances, any violation of
 
 Doyle
 
 was harmless.”
 

 Qualls v. State,
 
 927 So.2d 852, 855-56 (Ala.Crim.App.2005).
 

 In
 
 Qualls,
 
 we specifically overruled that portion of
 
 Mixon v. State,
 
 596 So.2d 605 (Ala.Crim.App.1991), that implied that the three-part test was the only standard to be used when evaluating a
 
 Doyle
 
 violation. We now question the continued validity of the
 
 Mixon
 
 test, specifically the first prong of that test, given the Supreme Court’s repeated caution that “overwhelming evidence of guilt does not render prejudicial error harmless.”
 
 Ex parte Phillips,
 
 962 So.2d 159, 163 (Ala.2006). See also
 
 Ex parte Hutcherson,
 
 677 So.2d 1205 (Ala.1996);
 
 Ex parte Greathouse,
 
 624 So.2d 208 (Ala.1993);
 
 Ex parte Malone,
 
 575 So.2d 106 (Ala.1990);
 
 Ex parte Weaver, 530
 
 So.2d 258 (Ala.1988);
 
 Ex parte Lowe,
 
 514 So.2d 1049 (Ala.1987);
 
 Ex parte Johnson,
 
 507 So.2d 1351 (Ala.1986). We believe that
 
 Mixon
 
 has been abrogated, in part, by the Alabama Supreme Court. However,
 
 Mixon
 
 still provides a helpful framework when evaluating a
 
 Doyle
 
 claim.
 

 In this case, the casual reference by Det. Cartee to the fact that Belisle asked for an attorney was promptly interrupted by the State. There was no other reference to this in the record. Last, the circuit court gave a thorough curative instruction. Given the totality of the circumstances in this case, we find that the
 
 Doyle
 
 violation was harmless beyond a reasonable doubt and that it did not affect Beli-sle’s substantial rights. See
 
 Qualls.
 

 XIX.
 

 Belisle next argues that there were numerous instances of prosecutorial misconduct that denied him a reliable trial. A review of the cited instances of alleged prosecutorial misconduct shows that no objections were made to the majority of the challenged instances.
 

 “While the failure to object will not bar our review of Calhoun’s claims of prosecutorial misconduct, it will weigh against any claim of prejudice that Calhoun makes on appeal ‘ “ ‘because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ ” ’
 
 Ferguson v. State,
 
 814 So.2d 925, 945 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001),
 
 cert. denied,
 
 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002), quoting
 
 Kuenzel v. State,
 
 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).”
 

 Calhoun v. State,
 
 932 So.2d 923, 962 (Ala.Crim.App.2005).
 

 Also, many of the instances involve challenges to arguments made by the prosecutor in his opening or closing statements.
 

 “ ‘In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the ai’-gument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.’
 
 Smith v. State,
 
 698 So.2d 189, 202-03 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted);
 
 Bush v. State,
 
 695 So.2d 70, 131 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). ‘The relevant question is whether the prosecutor’s comments “so infected the trial with unfairness as to make the resulting conviction a denial of due pro
 
 *303
 
 cess.” ’
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting
 
 Donnelly v. DeChristoforo,
 
 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial.
 
 Duren v. State,
 
 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). ‘Prosecutorial misconduct is subject to a harmless error analysis.’
 
 Bush v. State,
 
 695 So.2d at 131 (citations omitted);
 
 Smith v. State,
 
 698 So.2d at 203 (citations omitted).”
 

 Simmons v. State,
 
 797 So.2d 1134, 1161-62 (Ala.Crim.App.1999) (opinion on return to remand). We must view the challenged arguments in the context of the entire trial and not in the abstract. See
 
 Duren v. State,
 
 590 So.2d 360 (Ala.Crim.App.1990);
 
 Whitlow v. State,
 
 509 So.2d 252 (Ala.Crim.App.1987). It is proper for a prosecutor to argue any legitimate inference that may be drawn from the evidence. See
 
 Snyder v. State,
 
 893 So.2d 488 (Ala.Crim.App.2003).
 

 A.
 

 Belisle argues that the prosecutor improperly vouched for Annette’s testimony during closing arguments and implied that he would decide whether she would get out of prison.
 

 The prosecutor made the following argument in his rebuttal closing argument at the guilt phase:
 

 “I want to real quickly talk about the tales of the murdering, lying witnesses. I think I — of course, I don’t have as much experience as Mr. Hembree, but I don’t think I’ve ever seen so many murderers testify in court. And, yes, I’m talking about Annette Belisle. She’s a murderer. She’s a part of this. You’ve heard the Judge’s instructions already. If you even play a role ... in a felony in a burglary or robbery and somebody dies, that makes you guilty of felony murder. She’s a murderer. And she’s no friend of ours. And, like [defense counsel] I’m going to tell you to take everything Annette Belisle told you and throw it out the window, throw it out the door, and let us handle her.
 
 Let us handle her. Let us handle her. This is not her trial. We’re standing at the door of hell. And don’t worry, we’re not going to let her out.”
 

 (R. 1934-35.)
 

 During opening statements the prosecutor said: “We have made a deal with Annette Belisle. Unfortunately, sometimes if you want to get the devil, you’ve gotta go to hell for witnesses. She’s no friend of ours. We’ve made a deal with her. Investigator Gary Stanfield and Mike Turner were dealing with her then.” (R. 768.) Related to this same theme, defense counsel argued the following in his closing:
 

 “And I’m going to finish up by going back to the beginning. I’m sure y’all all remember at the very beginning, [the prosecutor] told you in opening statements, if you want to convict the devil, you have to go to hell to get your witnesses. Well, the prosecution didn’t go to hell for their witness [Annette Beli-sle]. Instead, they stood, and they still stand in the doorway of hell to be sure the devil herself doesn’t have to go back there anytime soon.”
 

 (R. 1933.) Clearly, the prosecutor’s comments were a reply-in-kind to defense counsel’s argument in closing. “ ‘When the door is opened by defense counsel’s argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.’ ”
 
 Davis v. State,
 
 494 So.2d 851, 855 (Ala.Crim.App.1986), quoting DeFoor,
 
 Prosecutorial Mis
 
 
 *304
 

 conduct in Closing Argument,
 
 7 Nova L.J. 443, 469 (1982-83). Given the defense counsel’s arguments, the prosecutor had a right to reply in kind, and his comments did not amount to error.
 

 B.
 

 Belisle next argues that the State bargained with Annette Belisle for perjured testimony. No objection was made on this basis at trial; thus, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 

 It is clear that the prosecutor’s agreement with Annette called for Annette to testify truthfully at her husband’s trial. We find no support for Belisle’s assertion in the record. Accordingly, we find no error.
 

 C.
 

 Belisle further argues that the prosecutor improperly vouched for the credibility of Investigator Gary Stanfield and the entire prosecution team when he made the following argument in rebuttal closing argument:
 

 “Y’all remember Mr. Hembree [defense counsel], Mr. Hembree who is making strong accusations about the State of Alabama, about hiding notes, hiding reports, not turning it over. I think I recall — and use your own judgment; if you didn’t hear this and it wasn’t said, then disregard what I’m about to say. But I could have sworn he was cross-examining Annette Belisle and he says, if — if someone comes into this courtroom and testifies that you and someone else, someone else, did this killing, would they be lying. Ask yourself if you heard that. Did you ever hear anybody come into this courtroom and testify to that? that Annette and someone else — that’s called dealing from the bottom of the deck. That’s dirty pool to suggest you’re going to hear some evidence like that and you never hear it. And then to have the nerve — to have the nerve to suggest that Gary Stanfield — Gary Stanfield who took a statement from the defendant wherein he says it was all — everything was an accident and could have hid the explanation of that. Detective Stanfield never had to bring that out. No one else was listening to that conversation. Detective Stanfield brought it out. The reason is because Detective Stanfield— you’ve seen the pictures. You saw what was done to Joyce Moore. You knew who he suspected. It would be so easy to forget about the rest of that conversation in his pursuit of convicting Rick Belisle. But Gary Stanfield pursued something else, and it’s called the truth. He wanted you to know the truth. And the truth was that in that statement where he said it was an accident, he goes on to say that I didn’t do it. And we believe in the truth. And we believe that when we hear that statement and the way he said it was all an accident that in that moment of weakness when he realized it was time to pay the piper and come back to Alabama, he tried to minimize it and say it was just an accident.”
 

 (R. 1941-42.) Clearly, the above comment was in response to a previous argument made by defense counsel. There is no indication that the prosecution’s argument was improper.
 

 D.
 

 Belisle argues that the prosecutor commented on Belisle’s failure to testify when he made the following argument:
 

 “But there was another thing, and there’s another — more evidence that we’ve got. That’s Tina Gorman. And that’s the statement that the defendant gave to Tina Gorman. Remember? She was asked by Mr. Hembree. Now,
 
 *305
 
 Mr. Belisle never admitted to you that he did anything or he never said that he did anything. Not at first. Bur later, he did. And told me he was involved.”
 

 (R. 1909.) A review of this statement shows that it was not a comment on Beli-sle’s failure to testify but was a comment on the conversation that Tina Gorman, an inmate who had been corresponding with Belisle while they were both in prison, had with defense counsel. There was no improper argument here.
 

 In this section of Belisle’s brief, he also challenges the following argument:
 

 “Members of the jury. You’ve now heard from several witnesses that have come up here and taken this witness stand, sworn on the Bible to tell the truth testify before you. Heard several witnesses. Heard witnesses put on by the State of Alabama, and you heard witnesses put on by the defense. The defense’s own witnesses. And of all these witnesses that you’ve heard, not one person has said Rick didn’t do it. Not one person.”
 

 (R. 1933-34.) He asserts that this argument was a comment on Belisle’s failure to testify.
 

 We have repeatedly held that similar remarks do not constitute error. As we stated in
 
 Arthur v. State,
 
 711 So.2d 1031, 1049-50 (Ala.Crim.App.1996):
 

 “ ‘The general rule is that statements by the prosecutor to the effect that State’s evidence is undenied or uncon-troverted are merely indirect references to the defendant’s failure to testify and thus do not violate the statute.
 
 Swain v. State,
 
 275 Ala. 508, 156 So.2d 368 [ (1963) ], affirmed on other grounds, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 [ (1964) ];
 
 Welch v. State,
 
 263 Ala. 57, 81 So.2d 901 [ (1955) ];
 
 Gore v. State,
 
 45 Ala.App. 131, 226 So.2d 674 [(1969)]. Under this rule the following remarks by prosecuting attorneys have been held permissible notwithstanding the statute: “Gentlemen, do you think we have proved those three elements? I submit to you that it is not denied, there is not a word come from this stand that denied the charge of rape.”
 
 Swain,
 
 supra. “Mr. Smith criticizes our witness in this case, but Mr. Smith has not given us any witness to criticize.”
 
 Broadway v. State,
 
 257 Ala. 414, 60 So.2d 701 [(1952)]. “The testimony of the State is uncontra-dicted and no one has denied it.”
 
 Gore,
 
 supra. “The fact that Mr. Johnson has been robbed was not contradicted.”
 
 White v. State,
 
 44 Ala.App. 312, 208 So.2d 222 [ (1968) ]. “The testimony of the state is undisputed. No testimony was presented from the witness stand to contradict any testimony of the State.”
 
 Williams v. State,
 
 43 Ala.App. 343, 190 So.2d 556 [ (1966) ]. The trial court may allow remarks of this tenor so long as the defendant is not the only witness capable of contradicting the State’s proof. If the prosecutor’s remarks can be interpreted as referring to the failure of the defense to produce as witnesses existing persons other than the defendant who should be [in] a position to testify in his favor, and who are known to him, then the general rule stated above applies and there [is] no violation of the statute. See
 
 Street v. State,
 
 266 Ala. 289, 96 So.2d 686 [ (1957) ];
 
 Broadway,
 
 supra;
 
 Gore,
 
 supra;
 
 Padgett v. State,
 
 45 Ala.App. 56, 223 So.2d 597 [ (1969) ];
 
 Williams,
 
 supra;
 
 Littlefield v. State,
 
 36 Ala.App. 507, 63 So.2d 565 [ (1952) ]; c.f.
 
 King v. State,
 
 45 Ala.App. 348, 230 So.2d 538 [ (Crim.App.1970) ].’ ”
 

 Quoting Sellers v. State,
 
 48 Ala.App. 178, 187, 263 So.2d 156, 164-65 (1972). There was no improper argument here.
 

 E.
 

 Belisle argues that the prosecutor improperly told the jury in his opening state
 
 *306
 
 ment to presume Belisle’s guilt. Specifically, he cites an isolated comment from the prosecutor’s opening statement. The entire comment consisted of the following:
 

 “Members of the jury, we have the burden to prove each of these elements to you beyond a reasonable doubt. That’s the burden that we not only ask for, we demand. That the defendant is entitled to. That this family is entitled to. But
 
 you don’t come back into this courtroom until you find him guilty of each of those elements beyond a reasonable doubt.
 
 Now, bear in mind, it’s not beyond all doubt. That’s not our burden. Our burden is a reasonable doubt. A gut feeling that you know in your gut.
 
 You know that he did this.
 
 Beyond a reasonable doubt. And that’s what we ask for, that’s what we demand in this case. That’s the law. That’s what we’re going to prove to y5all.”
 

 (R. 770-71.) Belisle only cites the highlighted portion in his brief. A review of the entire argument shows that the prosecutor was not telling the jury to presume that Belisle was guilty. The opposite is true. The prosecutor was explaining the State’s burden of proving Belisle’s guilt beyond a reasonable doubt. There was no improper argument here.
 

 F.
 

 Belisle argues that the prosecutor shifted the burden of proof to Belisle when he argued that “not a single witness has said Rick didn’t do it.”
 

 A review of the argument shows that the prosecutor was merely commenting on the evidence. As we stated above, such argument does not constitute error. See
 
 Arthur.
 

 G.
 

 Belisle argues that the prosecutor argued facts not in evidence. He cites three different instances in support of this assertion.
 

 1.
 

 Belisle argues that, during opening statements, the prosecutor argued facts that were never introduced when he stated that a witness, Debbie Nailer, a friend of the Belisles, was going to testify that Beli-sle wore Annette’s clothes. However, the record does not support this assertion. The record shows that
 
 defense counsel
 
 and not the prosecutor made the following argument:
 

 “Debbie Nailer is going to come in here — I assume; she’s on their list — and she’s going to testify that Rick used to wear Annette’s clothes.”
 

 (R. 796.) Thus, this argument is meritless.
 

 2.
 

 Belisle argues that the prosecutor improperly argued in closing that Tina Gorman, an inmate who had been corresponding with Belisle while they were both in prison, testified that Belisle initially denied his guilt but later admitted that he was involved in the offense. He asserts that this information was not elicited during Gorman’s testimony.
 

 However, a review of the record shows that this testimony was admitted during defense counsel’s cross-examination of Gorman and the State’s subsequent rebuttal. The following occurred:
 

 “[Defense counsel]: Rick has always told you that he was innocent of that crime, hasn’t he, Tina?
 

 “[Gorman]: At first he did.
 

 “[Defense counsel]: I mean, he never told you that he killed Joyce Moore, did he?
 

 “[Gorman]: No, he has never directly told me that.
 

 “[Defense counsel]: That’s all I have.
 

 “Redirect Examination.
 

 
 *307
 
 “[Prosecutor]: Has he ever told you anything that would lead you to believe he did?
 

 “[Gorman]: Only that he was present.” (R. 1553.) It is clear that the prosecutor was properly commenting on facts that had been presented at trial.
 

 3.
 

 Belisle argues that the prosecutor improperly argued that Chris Moore, a neighbor of the Belisles, said that Belisle asked if anyone had any leads on suspects in the murder when, he argues, the testimony showed that it was Annette who asked Moore that question. Belisle cites no portion of the closing argument that supports this assertion. In fact, our review of the record shows that the opposite is true. During closing argument, the prosecutor stated:
 

 “Remember Chris Moore? She testified. She talked about going to see the Belisles on the Thursday after the killing. What did she tell us about what she witnessed and what she observed? Annette Belisle is crying and talking constantly about the killing. What was he doing? He was pacing and acting nervously. Not crying and upset. Not remorseful. But concerned because when Annette Belisle called the family to say, How’s it going? How are y’all doing? Do you remember his question? Do they have any lead? Do they have any suspects?”
 

 (R. 1907.) The record does not support Belisle’s assertion.
 

 H.
 

 Belisle next argues that one of the prosecutors interfered with the defense investigation when he told Valeire Wheeler, an inmate at Tutwiler Prison who had been incarcerated at the same time as Annette, not to talk to anyone about the case.
 

 Wheeler testified that she sent a letter to Assistant Attorney General William Dill and told him about a conversation she had overheard between Annette and a fellow inmate. In this conversation Annette said that she hit the victim with a can of peas or beans and told the man with her to hit the victim with an iron bar. Wheeler testified that as a result of her letter, Dill and an investigator visited her at Tutwiler Prison. She said that they told her not to talk to anyone about the case.
 

 There is no indication that the defense was not aware of this witness’s testimony prior to her taking the stand. In fact, defense counsel admitted that his investigator had uncovered additional inmate witnesses. There is no indication that Belisle was prejudiced in any way or that the prosecution impeded the defense investigation.
 

 I.
 

 Belisle argues that the State failed to timely disclose material evidence. First, he argues that the State failed to give defense counsel the criminal histories of the State witnesses.
 
 [7]
 
 The page cited in the record to support this contention shows that on the day of trial the defense mentioned that it had gotten no information on Juanita Pitts. However, we note that Pitts was not called as a State witness but was called as a defense witness. Therefore, this contention is not supported by the record.
 

 Second, Belisle argues that the State failed to produce Valeire Wheeler’s handwritten notes based on a conversation
 
 *308
 
 she overheard between Pitts and Annette. It appears that during discovery the defense was furnished a copy of the letter Wheeler wrote Dill and three pages of notes. During Wheeler’s testimony it appeared that the defense was given Pitts’s copy of the notes on the conversation and not Wheeler’s copy. When questioned, Wheeler said that the letter contained almost the same information as what was contained in the handwritten notes. It is also clear that Belisle’s investigator had talked with both Valeire Wheeler and Juanita Pitts and was aware of the discrepancy in the handwritten notes. There is no indication that any prejudice occurred here.
 

 Last, Belisle argues that the cumulative effect of the prosecutorial misconduct requires reversal. A review of the record shows that the cumulative effect of the alleged errors did not affect Belisle’s substantial rights.
 
 Ex parte Tomlin,
 
 540 So.2d
 
 668
 
 (Ala.1988).
 

 XX.
 

 Belisle argues that the circuit court’s jury instructions were flawed for several reasons.
 

 “ ‘ “In setting out the standard for plain error review of jury instructions, the court in
 
 United States v. Chandler,
 
 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited
 
 Boyde v. California,
 
 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’
 
 Williams v. State,
 
 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997),
 
 cert. denied,
 
 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).” ’
 

 “Broadnax v. State, 825
 
 So.2d 134, 196 (Ala.Crim.App.2000), quoting
 
 Pilley v. State,
 
 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, ‘[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.
 
 Ingram v. State,
 
 779 So.2d 1225 (Ala.Cr.App.1999).’
 
 Johnson v. State,
 
 820 So.2d 842, 874 (Ala.Crim.App.2000).”
 

 Snyder v. State,
 
 893 So.2d 488, 548 (Ala.Crim.App.2003). “The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.”
 
 Ex parte Boyd,
 
 715 So.2d 852, 855 (Ala.1998).
 

 With these principles in mind, we review the challenged instructions.
 

 A.
 

 Belisle first argues that the court failed to give a cautionary instruction on the fact that an accomplice’s testimony must be corroborated.
 

 However, the record does not support Belisle’s argument. A review of the court’s jury instructions shows that the court gave two instructions on accomplice testimony. The circuit court first defined an accomplice and then gave a detailed instruction on the fact that Belisle could not be convicted solely on the basis of an accomplice’s testimony, unless that testimony was corroborated by other evidence tending to connect Belisle with the commission of the offense. Though the court did not specifically instruct the jury that Annette was an accomplice, it was “abundantly clear” that Annette had pleaded guilty to the same offense in exchange for a 20-year sentence; therefore, any error in the court’s failure to specifically name Annette as the accomplice was harmless. See
 
 Duke v. State,
 
 889 So.2d 1 (Ala.Crim.
 
 *309
 
 App.2002), vacated on other grounds, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005). There was no plain error here.
 

 B.
 

 Belisle next asserts that the court’s instructions on reasonable doubt violated the United States Supreme Court’s holding in
 
 Cage v. Louisiana,
 
 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because, he says, the court equated reasonable doubt with an “abiding conviction” thus, he argues, lowering the State’s burden of proof.
 

 The circuit court gave the following charge on reasonable doubt:
 

 “Now, the phrase ‘reasonable doubt’ that I’ve used is somewhat self-explanatory. Efforts to define it do not always clarify the term. Now, a reasonable doubt is not a mere guess or surmise. It is a doubt based on reason and logic and not upon speculation. If, after considering all the evidence in the case, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural, or speculative doubt but is a reasonable doubt arising from the evidence or from a part of the evidence or from a lack of evidence. And it remains after a careful consideration of the testimony such as reasonable, fair-minded, and conscientious people would entertain under all circumstances.
 

 “Now, the State is not required to convince you of the defendant’s guilt beyond all doubt and to a mathematical certainty, nor beyond a shadow of a doubt, but simply beyond all reasonable doubt. But if, after comparing and considering all the evidence in the case, your minds are left in such a condition that you cannot say you have an abiding conviction of the defendant’s guilt, then you are not convinced beyond a reasonable doubt and the defendant would be entitled to an acquittal.”
 

 (R. 1867-69.) This Court in
 
 Stallworth v. State,
 
 868 So.2d 1128, 1164 (Ala.Crim.App.2001), approved a similar instruction and stated: “The trial court’s instructions concerning reasonable doubt were thorough and correct and did not violate
 
 Cage.”
 
 We likewise find no error in the circuit court’s instructions on reasonable doubt.
 

 C.
 

 Belisle argues that the court erred in reinstructing the jury only on the elements of capital murder.
 

 The record shows that sometime during deliberations, the jury returned with a question. The foreman asked the court to “read the seven elements required to convict in Count One and Count Two once again for us.” The court then asked the foreman to explain the question. The foreman told the court that the jury wanted to hear the different elements of capital murder in Count I and Count II of the indictment. The court then repeated just those instructions.
 

 “ ‘ “When a jury requests additional instructions the recommended practice is for the trial court to remain within the area of the specific request in making his response.
 
 East v. State,
 
 339 So.2d 1104, 1106-07 (Ala.Cr.App.1976). A trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury.
 
 White v. State,
 
 195 Ala. 681, 686, 71 So. 452 (1916);
 
 Thomas v. State,
 
 393 So.2d 504, 508 (Ala.Cr.App.1981). It is assumed that the jury will consider the previously
 
 *310
 
 given instructions along with those given in the supplemental charge.
 
 Turner v. State,
 
 160 Ala. 40, 47, 49 So. 828 (1909).”
 

 “
 
 ‘Davis v. State,
 
 440 So.2d 1191, 1195 (Ala.Cr.App.1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984). See also
 
 Deutcsh v. State,
 
 610 So.2d 1212, 1217-18 (Ala.Cr.App.1992).’
 

 “Miller v. State,
 
 645 So.2d 363, 365 (Ala.Cr.App.1994). ‘[A] trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury, and it is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge.’
 
 Fountain v. State,
 
 586 So.2d 277, 281 (Ala.Cr.App.1991).”
 

 Clemons v. State,
 
 720 So.2d 961, 984 (Ala.Crim.App.1996).
 

 Here, the circuit court correctly limited its repeat instructions to those specifically requested by the jury. No error occurred here.
 

 D.
 

 Belisle next argues that the court erred in instructing the jury that flight could be considered as evidence of a consciousness of guilt. He cites
 
 Ex parte Weaver,
 
 678 So.2d 284 (Ala.1996), to support his argument that he is entitled to have his conviction reversed.
 

 The court gave the following instruction on flight:
 

 “Now, the State has introduced some evidence to the effect that the defendant fled after the commission of the offense. Under our law, the State is allowed to show flight on the part of the accused. As to such evidence, you 'should first determine whether the defendant did in fact flee. If you find that the defendant fled, then you must determine whether the defendant fled from a consciousness of guilt or if there was some other reason. If you determine that such flight, if there — if any there was, from a consciousness of guilt, then such flight is a circumstance which might tend to infer guilt on the part of the defendant and may be considered along with all the other evidence in the case. On the other hand, if you find that the defendant fled not because of a consciousness of guilt but because of some other reason, then such flight, if any there was, should not be considered as any indication or inference of the defendant’s guilt. Whether the defendant did, in fact, flee and the reason for such flight, if any such flight there was, is to be determined by you from the evidence.”
 

 (R. 1864-65.)
 

 The Alabama Supreme Court in
 
 Weaver
 
 held that the trial court’s instruction on flight was improper because “the instruction did not inform the jury that it had the responsibility to determine in the first instance what [the defendant’s] motivation was in [fleeing].” 678 So.2d at 287. The Court further noted that there was no evidence of flight, because the murder occurred in December 1989 and the defendant had not left the state until September 1990.
 

 In this case, there was evidence that tended to show that Belisle fled the jurisdiction when he moved to Missouri just two days after the murder. Also, the court’s instruction on flight did not inform the jury that Belisle’s move was to avoid prosecution. Instead, the court properly instructed the jury that it was for them to determine if the State had, in fact, presented any evidence of flight. The circuit court’s instructions on flight were correctly given and were accurate. See
 
 Rogers v. State,
 
 630 So.2d 88 (Ala.1992).
 

 
 *311
 
 E.
 

 Belisle argues that the court erred in failing to sua sponte give a limiting instruction regarding the use of Annette’s conviction for felony murder.
 
 [8]
 

 This matter was not brought to the circuit court’s attention; therefore, we are limited to determining whether there is plain error. See Rule 45A, Ala.R.App.P.
 

 However, the court did give the following limiting instruction:
 

 “Now, it has been brought out that at some time in the past that a witness or witnesses were convicted of a crime. That evidence was allowed by the Court for the sole purpose of affecting the weight you are to give to the witness. The only consideration you should give to the prior conviction is in determining what weight you will give the testimony of the witness and it was admitted for no other purpose. The law is that when a witness who testifies is shown to have been convicted prior to the trial of this offense of a crime involving a false statements — and ladies and gentlemen, I charge you that murder and attempted murder are felonies — then you may, if you choose, disregard the entire testimony of that person. It does not mean that you must necessarily disregard their testimony either in whole or in part, for there may be other evidence in the case or other facts or circumstances in evidence which in your judgment may tend to support or corroborate the testimony of the witness so impeached. As I have stated, you are the judges of the credibility of the witnesses, and that is a matter for your determination.”
 

 (R. 1863-64.)
 
 [9]
 
 For these reasons, we find no plain error.
 

 F.
 

 Belisle next argues that the circuit court’s instruction shifted the burden of proof to Belisle when it instructed the jury that “it should not speculate where there is no evidence.”
 

 The court gave the following instruction: “In other words, use your good common sense.
 

 “You should take this knowledge with you and use it to determine what the true facts are and the weight you are to give to each part of the testimony and evidence. Ladies and gentlemen, you’re not to speculate where there is no evidence. But where there is conflicting evidence, use your common sense to resolve the conflict.”
 

 (R. 1861.) The court gave a thorough instruction on the State’s burden of proof. We approved of a similar instruction in
 
 Dorsey v. State,
 
 881 So.2d 460 (Ala.Crim.App.2001), aff'd in part, rev’d on other grounds, 881 So.2d 533 (Ala.2003).
 

 G.
 

 Belisle argues that the court’s instructions implied that the jury should reach a guilty verdict because, he argues, the court instructed the jury “when you are convinced from the evidence that the defendant is guilty beyond a reasonable doubt” the presumption of innocence no longer applies to the defendant.
 

 The court gave the following instruction:
 

 “Ladies and gentlemen, the defendant in this case for his plea and in answer to the indictment says that he is not guilty. Now, this places upon the prosecution the burden of proving his guilt beyond a reasonable doubt. The burden never
 
 *312
 
 rests upon the defendant to establish his innocence. In regard to this, I instruct you that the defendant is presumed to be innocent and the presumption that he is innocent remains until such time as each of you is convinced from the evidence that the defendant is guilty beyond a reasonable doubt. This presumption of innocence is to be regarded by you as a matter of evidence and it is a benefit to which the defendant is entitled. And it attends the defendant throughout the trial. Only when you are convinced from the evidence that the defendant is guilty beyond a reasonable doubt does the presumption that he is innocent leave him.”
 

 (R. 1866-67.) The above instruction is similar to the Alabama Pattern Jury Instruction on the presumption of innocence. We held in
 
 Breeding v. State,
 
 523 So.2d 496 (Ala.Crim.App.1987), that a similar instruction was proper. See also
 
 Grace v. State,
 
 456 So.2d 862 (Ala.Crim.App.1984).
 

 H.
 

 Belisle argues that the court erred in denying his request for an instruction on the lesser included offense of robbery and burglary.
 

 There was no evidence presented that the murder occurred separately from the robbery or the burglary. As we stated in
 
 Stallworth v. State,
 
 868 So.2d 1128, 1165 (Ala.Crim.App.2001):
 

 “There was also no rational basis for giving an instruction on theft. There was no evidence presented that the robberies and the murders were separate and distinct crimes. ‘The appellant was also not entitled to have the jury charged on the lesser included offense of robbery [or theft]. Because there was a killing in the course of and in furtherance of a robbery, “[i]t is clear ... that the appellant is at least guilty of felony murder.”
 
 Kinder v. State,
 
 515 So.2d 55, 72 (Ala.Cr.App.1986).’
 
 Tucker v. State,
 
 650 So.2d 584, 536 (Ala.Crim.App.1994).”
 

 The circuit court did not err in refusing to instruct the jury on the lesser-included offenses of robbery and burglary.
 

 I.
 

 Belisle next argues that the circuit court’s instructions on what constitutes a deadly weapon were improper because the list of items defined as “deadly weapons” in § 13A-1-2(7), Ala.Code 1975, were omitted. He cites
 
 Ex parte Cobb,
 
 703 So.2d 871 (Ala.1996), in support of his assertion. He argues: “The omission of the list of items provided by the statute is problematic in the context of this case, where the alleged instrument that caused Joyce Moore’s death was a can of peas.” (Belisle’s brief at p. 100.)
 

 Belisle implies that the six-pound can of peas that was one of the items used to bludgeon Moore to death could never be a deadly weapon. We do not agree.
 

 In
 
 Harris v. State,
 
 873 So.2d 1171 (Ala.Crim.App.2003), this Court decided whether a “cinder block” that had been thrown into a moving vehicle could be a “deadly weapon” as set out in § 13A-5-6, Ala.Code 1975. We stated:
 

 “In
 
 Harris [v. State],
 
 705 So.2d [542,] 548 [ (Ala.Crim.App.1997) ], we noted:
 

 “ ‘To assist us in determining whether a glass soft drink bottle may be classified as a “deadly weapon” for purposes of applying § 13A-5-6(a)(4), we look to the Alabama Supreme Court, which recently stated in
 
 Ex parte Cobb,
 
 703 So.2d 871, 875 (Ala.1996), that “the legislature intended to include as deadly weapons only things that are similar to the listed weapons. Only [inanimate] objects that are ‘designed, made or adapted for the pur
 
 *313
 
 poses of inflicting death or serious physical injury’ fit the definition of ‘deadly weapon.’ ” The issue in
 
 Cobb
 
 was whether a person’s fists could be considered a deadly weapon.
 

 “ ‘Although a glass bottle is not specifically included in the list of weapons defined as “deadly weapons,” a bottle may be “adapted for the purposes of inflicting death or serious physical injury,” and may therefore be a “deadly weapon.” In
 
 Cooper v. State,
 
 584 So.2d 920, 921 (Ala.Cr.App.1991), we affirmed a sentence for first degree robbery enhanced pursuant to § 13A-5—6(a)(4), where the appellant used a broken bottle as a dangerous weapon. See also
 
 Christian v. State,
 
 351 So.2d 616 (Ala.Cr.App.1976), rev’d on other grounds, 351 So.2d 623 (Ala.1977). Clearly, a bottle may be adapted and used as a deadly weapon.
 

 “ ‘The record indicates that the appellant used the glass soft drink bottle to strike the victim on the head and in a manner unrelated to its innocent and useful purpose. The bottle was full of liquid and therefore had some weight, and was obviously hard. The bottle was capable of causing serious injury either broken or unbroken. As a result of the blow, the victim.suffered a cut, bled profusely, and required an undetermined number of stitches. Although the appellant was fortunate that the force of his blow to the victim’s head did not cause death or permanent serious physical injury, the possibility of death or serious physical injury was present, given the size and weight of the bottle, the location of the blow, and the other circumstances that were proven. The manner in which the appellant used the bottle was sufficiently similar to the manner in which one would use a billy club or bludgeon to qualify as a deadly weapon for purposes of the application of § 13A-5-6(a)(4). The trial court correctly determined that the glass soft drink bottle was a deadly weapon.’
 

 “The appellant argues that the definition of deadly weapon is limited to weapons that are similar to those listed in § 13A-l-2(7), Ala.Code 1975, and that are used ‘to make direct contact while being held in the perpetrator’s hand and making contact with the body of the victim.’ (Appellant’s brief at p. 9.) He also appears to contend that a thrown object cannot constitute a deadly weapon. However, such a reading of § 13A-1-2(7), Ala.Code 1975, is too limited and would thwart the purpose of the statute.
 

 “We hold that a proper determination of whether an object constitutes a deadly weapon should be made based on the totality of the circumstances of the case, including the nature of the object, the manner in which it is used, and the circumstances surrounding its use. Under the circumstances of this case, we conclude that the piece of a concrete block the appellant threw into Chat-mon’s vehicle was ‘adapted for the purposes of inflicting death or serious physical injury.’ § 13A-1-2(7), Ala.Code 1975. Therefore, it constituted a deadly weapon .... ”
 

 873 So.2d at 1173-74. Here, based on the totality-of-the-circumstances, it is clear that the six-pound can of peas constituted a deadly weapon. See also
 
 Kennedy v. State,
 
 698 So.2d 1174, 1176 n. 2 (Ala.Crim.App.1997) (“[W]e do not believe that the [Supreme] Court intended that its narrow ruling in
 
 Cobb
 
 — that the use of fists or other body parts cannot constitute the use of a deadly weapon or dangerous instrument — to be construed to mean that a tire tool, or other similar instrument, could
 
 *314
 
 never be considered a deadly weapon as that term is defined in § 13A-1-2(11).”).
 

 Also, the court gave the following instruction: “A deadly weapon is a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious physical injury.” This instruction is consistent with Alabama law and did not amount to plain error. Cf.
 
 Ex parte Windsor,
 
 683 So.2d 1042 (Ala.1996).
 

 J.
 

 Last, Belisle argues that the circuit court erred in failing to sua sponte give a jury instruction on the use of Belisle’s prior bad acts.
 

 In
 
 Burgess v. State,
 
 962 So.2d 272 (Ala.Crim.App.2005), we stated:
 

 “Relying on the Supreme Court’s decision in
 
 [Ex parte
 
 ]
 
 Minor,
 
 [780 So.2d 796 (Ala.2000),] we reversed the conviction in
 
 Snyder v. State,
 
 893 So.2d 471 (Ala.Crim.App.2001), because the trial court failed to sua sponte instruct the jury on the use of the prior convictions when those convictions were introduced for the purpose of impeaching the defendant. The Supreme Court reversed this Court’s judgment in
 
 Snyder
 
 and narrowed its earlier holding in
 
 Minor.
 
 The Supreme Court stated:
 

 “ ‘This Court, in finding that plain error had occurred in
 
 Ex paite Minor,
 
 recognized that Minor’s testimony was extremely damaging, that the need for an instruction limiting the use of the evidence was obvious, and that the failure to give the instruction was so prejudicial that it affected Minor’s substantial rights. While the Court found plain error in the trial court’s failure to instruct the jury on the purpose of the evidence of Minor’s prior conviction, the Court’s holding in that regard did not establish a
 
 per se
 
 rule. See
 
 United States v. Waldrip,
 
 981 F.2d 799 (5th Cir.1993)(clarifying
 
 United States v. Diaz,
 
 585 F.2d 116 (5th Cir.1978), and holding that whether a failure to instruct on the limited use of prior-conviction evidence was error was to be determined on a case-by-case basis). Thus, each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis.’
 

 “Snyder v. State,
 
 893 So.2d 482, 485 (Ala.2001). The Supreme Court found that under the circumstances presented in that case the Court’s failure to give the jury a limiting instruction was harmless beyond a reasonable doubt. The Supreme Court cited and relied on
 
 United States v. Waldrip,
 
 981 F.2d 799 (5th Cir.1993), to support its decision.
 

 “In
 
 Waldrip,
 
 the defendant was charged with defrauding two banks and with making false statements to influence a financial institution. The government introduced a letter the defendant had fraudulently signed using an accountant’s name and evidence that the defendant had previously committed ‘bank robbery.’ The court found that the prior bad acts were admissible to impeach Waldrip. The United States Court of Appeals for the Fifth Circuit, in determining whether the trial court erred in failing sua sponte to give a limiting instruction on the use of the prior bad acts, stated:
 

 “ ‘When the particular facts of this case are examined, we find that unlike
 
 [United States v.] Diaz,
 
 [585 F.2d 116 (5th Cir.1978),] the trial court did not commit plain error. In view of the other evidence against Waldrip, the evidence of her previous acts of forgery and bank robbery was not extremely damaging. The government
 
 *315
 
 clearly established all the elements of the charged offenses. In addition, the need for a limiting instruction was not obvious. Counsel may refrain from requesting an instruction in order not to emphasize potentially damaging evidence, and for other strategic reasons.
 
 [United States v.] Barnes,
 
 586 F.2d [1052] at 1059 [ (5th Cir.1978) ]. Finally, although we cannot fairly say that the evidence of prior conduct was not damaging, it was not so damaging as to require us to reverse on the basis of plain error.
 

 “ ‘Although the district court should have cautioned the jury to consider the extrinsic act evidence only as it related to Waldrip’s character for truthfulness, it did warn the jury
 

 “ ‘ “The defendant is not on trial for any act, conduct or offense not alleged in the superseding indictment.”
 

 “ ‘Record Vol. 11 at 28. We are therefore unable to conclude that the district court’s jury instructions were so deficient that they significantly prejudiced Waldrip’s rights.’
 

 “981 F.2d at 805-06.
 

 “This case is factually indistinguishable from
 
 Waldrip.
 
 Here, the evidence against Burgess was overwhelming. Also, the circuit court gave the jury the following instruction:
 

 “ ‘The accused is not on trial for any act, or conduct, not alleged in the indictment. Regardless of your personal views, as jurors, you are not to concern yourselves with the lawfulness, or the unlawfulness of any prior incidents of behavior between the Defendant and any victim in this case.’
 

 “(Record on appeal p. 2803.) Based on the Supreme Court’s decision in
 
 Snyder,
 
 under the circumstances here the circuit court’s failure sua sponte to instruct the jury on the use of the prior bad acts would not have prejudiced Burgess’s substantial rights. See Rule 45A, Ala.R.App.P.”
 

 962 So.2d at 284.
 

 Here, we can only describe the reference to a prior charge as vague at best. There is no indication that the jury was made aware of the contents of the fingerprint card. There was no reference made to the card when it was admitted or at any other point in the trial. Also, the card was one of 115 exhibits that were introduced and admitted by the State. Under the unique circumstances presented in this case, we hold that the circuit court did not err in failing to sua sponte give a limiting instruction on the use of prior bad acts. See
 
 Burgess.
 

 Moreover, as previously stated, the circuit court did give a limiting instruction on the use of prior convictions and told the jury that they were not to used as substantive evidence of guilt.
 

 Penalty-Phase Issue
 

 XXI.
 

 Belisle argues that he was not fully informed of the rights he was waiving when he waived the jury’s participation in the sentencing phase of his capital trial. Specifically, he argues that he was not adequately informed.
 

 This claim was never presented to the circuit court; therefore, our review is limited to determining whether there is plain error. Rule 45A, Ala.R.App.P.
 

 The record shows that, before sentencing, defense counsel informed the court that Belisle had asked his attorneys not to present any evidence in mitigation and had told them that he wished to waive the jury’s participation in the sentencing hearing. Belisle had executed a written waiver of the jury’s participation in sen
 
 *316
 
 tencing; this waiver was marked as court’s exhibit 5.
 
 [10]
 
 Also, the court had an extensive colloquy with Belisle about waiving this right. It is clear that Belisle had discussed this with his attorneys. The following occurred:
 

 “The Court: Okay. Why don’t we mark that as Court’s Exhibit 5.
 

 “Okay, Mr. Belisle, I have here what I’ve marked for identification purposes as Court’s Exhibit 5 which appears to be a written waiver of the jury’s participation in the sentencing phase of the trial; is that correct?
 

 “[Belisle]: Yes, sir.
 

 “The Court: Okay. Do you understand that you have a right to have the jury to listen — in this stage of the proceedings to listen to opening statement of counsel, to present evidence of mitigating factors and circumstances in your favor?
 

 “[Belisle]: Yes, sir. I understand.
 

 “The Court: Do you also understand that your attorneys would present that evidence, the jury would hear that evidence, and at the end of that proceeding your attorneys would also have an opportunity to argue those mitigating circumstances which would — which would tend to say that a sentence of life without the possibility of parole is more appropriate than the death penalty? Do you understand that your lawyers would do that for you?
 

 “[Belisle]: Yes, sir. I understand that.
 

 “The Court: All right. And do you also understand that after your attorneys argue your position to the jury, and, of course, the State would have an opportunity to do the same, the State would be presenting aggravating circumstances to the jury which would tend to lean in favor of the death penalty? You understand they would do that at that hearing?
 

 “[Belisle]: Yes, sir. I understand.
 

 “The Court: And you understand that I would instruct the jury concerning the law of finding those aggravating circumstances, what requirements have to be met and also what requirements should be met in finding mitigating circumstances?
 

 “[Belisle]: I understand, sir.
 

 “The Court: You also understand I would instruct the jury that they should weigh those aggravating and mitigating circumstances to determine what an appropriate sentence should be in your case?
 

 “[Belisle]: Yes, sir.
 

 “The Court: You understand that the jury would then go back, deliberate as they did in this case and would make a jury recommendation to the Court as to what the appropriate sentence should be in this case?
 

 “[Belisle]: Yes, sir.
 

 “The Court: All right. And knowing all of that, let me ask you: Have you been — have you been coerced in any way to get you to waive the right that you have to have the jury to make that recommendation?
 

 “[Belisle]: No, sir.
 

 “The Court: Have you been threatened in any way or given any promises or made any assurances to get you to waive that right?
 

 “[Belisle]: No, sir.
 

 “The Court: All right. Are you under the influence of any drugs, alcohol, or
 
 *317
 
 medication at the present time that would in any way affect your ability to think, reason, or make decisions for yourself of this nature?
 

 “[Belisle]: No, sir.”
 

 (R. 1982-84.)
 
 [11]
 
 We have held that a similar colloquy was sufficient to constitute a waiver of a defendant’s right to have the jury participate in the sentencing phase of a capital trial.
 
 [12]
 
 See
 
 Peraita v. State,
 
 897 So.2d 1161 (Ala.Crim.App.2003). As we stated in
 
 Turner v. State,
 
 924 So.2d 737 (Ala.Crim.App.2002):
 

 “The United States Supreme Court in
 
 Proffitt v. Florida,
 
 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), stated:
 

 “ ‘This Court has pointed out that jury sentencing in a capital case can perform an important societal function,
 
 Witherspoon v. Illinois,
 
 391 U.S. 510, 519 n. 15 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.’
 

 “428 U.S. at 252, 96 S.Ct. 2960 (footnote omitted). The right to have a jury recommend a sentence in a capital case is a right afforded by statute — not the Alabama Constitution of 1901. See § 13A-5-45, Ala.Code 1975. A waiver of a statutory right requires a lower standard to uphold than a waiver of a constitutional right. See
 
 Ex parte Dunn,
 
 514 So.2d 1300 (Ala.1987), and
 
 Watson v. State,
 
 808 So.2d 77 (Ala.Crim.App.2001).”
 

 924 So.2d at 782. Here, the record shows that the circuit court complied with the requirements of § 13A-5-44(c), Ala.Code 1975.
 
 [13]
 

 XXII.
 

 Belisle argues that the State erred in presenting victim-impact evidence during the sentencing hearing.
 

 The record shows that at the sentencing hearing before the trial court, the State called three of the victim’s family members to testify about her life, their relationship with her, and the impact of her death on their lives. None gave their opinion of the sentence that Belisle should receive. We have found no error in the presentation of such evidence at the penalty phase of a capital trial. See
 
 Maxwell v. State,
 
 828 So.2d 347 (Ala.Crim.App.2000).
 

 
 *318
 
 Belisle also argues that the prosecutor improperly argued that Belisle should be sentenced to death based on victim-impact testimony.
 

 “We presume that trial court judges know and follow the law.
 
 See Ex parte Slaton,
 
 680 So.2d 909, 924 (Ala.1996) (‘Trial judges are presumed ... to know the law and to follow it in making their decisions.’); and
 
 Carter v. State,
 
 627 So.2d 1027, 1028 (Ala.Crim.App.1992) (‘A trial judge’s actions are presumptively correct in the absence of a showing to the contrary.’).”
 

 Ex parte Atchley,
 
 936 So.2d 513, 516 (Ala.2006). We find no error here.
 

 XXIII.
 

 Belisle argues that Alabama’s method of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment. Belisle makes no individual claim that, as applied to him, death by lethal injection violates the Eighth Amendment.
 

 In
 
 Bryant v. State,
 
 951 So.2d 732 (Ala.Crim.App.2005) (opinion on return to remand), we stated:
 

 “We note that Alabama’s statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in
 
 Travis v. State,
 
 776 So.2d 819, 873 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant’s constitutional rights[
 
 14
 
 ] Indeed, a number of jurisdictions have rejected such claims. See, e.g.,
 
 Sims v. State,
 
 754 So.2d 657, 668 (Fla.2000);
 
 State v. Carter,
 
 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000);
 
 Ritchie v. State,
 
 809 N.E.2d 258, 262 (Ind.2004);
 
 Wheeler v. Commonwealth,
 
 121 S.W.3d 173, 186 (Ky.2003).3 Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.
 

 [[Image here]]
 

 “3 Indeed, the only case we know of successfully challenging execution by lethal injection involved an inmate’s individualized claim that death by lethal injection would violate the Eighth Amendment’s prohibition against cruel and unusual punishment because he suffered from collapsed veins. See
 
 Nelson v. Campbell,
 
 541 U.S. 637 (2004). Bryant makes no such individualized claim. Thus, he is entitled to no relief on his claim that death by lethal injection constitutes cruel and unusual punishment.”
 

 951 So.2d at 747-48. Belisle is due no relief on this claim.
 

 XXIY.
 

 Belisle argues that his sentence of death violates the United States Supreme Court’s decision in
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In
 
 Apprendi v. New Jersey,
 
 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that any fact that increases a sentence above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. This holding was ex
 
 *319
 
 tended to death-penalty cases in
 
 Ring v. Arizona.
 

 In this case, the jury convicted Belisle of committing a murder during the course of a robbery and a burglary. Either one of the underlying felonies was sufficient to expose Belisle to the death penalty. As the Alabama Supreme Court stated in
 
 Ex parte Waldrop,
 
 859 So.2d 1181, 1188 (Ala.2002):
 

 “Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Wal-drop’s case, the jury, and not the trial judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’
 
 Ring,
 
 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all
 
 Ring
 
 and
 
 Apprendi
 
 require.”
 

 He further argues that a jury, and not a judge, should weigh the aggravating versus the mitigating factors and determine their weight.
 
 [15]
 
 In
 
 Waldrop,
 
 the Alabama Supreme Court also stated:
 

 “[T]he determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently,
 
 Ring
 
 and
 
 Apprendi
 
 do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.”
 

 859 So.2d at 1190. There was no violation of the United State’s Supreme Court decision in
 
 Ring.
 

 Sentencing Order
 

 XXV.
 

 Belisle argues that the circuit court’s order fixing his sentence at death contains several “errors that mandate relief.”
 

 A.
 

 Belisle first argues that the court failed to consider and find mitigating evidence. Specifically, he argues that his 10-year-old burglary conviction was not sufficient to negate the mitigating circumstance of “no significant history of prior criminal activity.”
 

 We held in
 
 Clisby v. State,
 
 456 So.2d 102 (Ala.Crim.App.1983), that a prior conviction for first-degree burglary was sufficient to negate the mitigating circumstance of “no significant history of prior criminal activity.” See also
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim.App.2001) (assault in the third degree can negate this mitigating circumstance).
 
 [16]
 

 B.
 

 Belisle next argues that the court erred in failing to consider the leniency given his codefendant as a mitigating circumstance. He cites the case of
 
 Ex parte Burgess,
 
 811 So.2d 617 (Ala.2000), in support of his assertion.
 

 
 *320
 
 In this case, the circuit court stated the following in its sentencing order concerning Annette’s sentence:
 

 “In addition to those mitigating circumstances set out by statute, the Court considered the following non-statutory mitigating circumstance that could be argued to exist: (1) The disparity and criminal treatment of the codefendant. The evidence disclosed that Annette Be-lisle now has an agreement with the State that
 
 if she testified truthfully
 
 at Rick Belisle’s trial, she would be allowed to plead guilty to the lesser-included offense of felony murder and was to receive a 20 year sentence. The Court finds her testimony credible in some respects and not credible in others. It is credible in that she and [Rick Belisle] planned these crimes and that Annette Belisle participated in assisting [Rick Belisle] to hide in the ceiling, as well as giving him the combination to the safe earlier. The Court does believe that she was not present when [Rick Belisle] killed Joyce Moore and that when .Rick Belisle returned home that he told her what had happened and the way it happened. The Court is not sure that the State will even make the deal available to Annette Belisle at this time. But for purposes of this hearing, the Court will assume that it will be made. The Court finds that the plea deal of the codefen-dant in this case is not a disparity and is not a mitigating factor in this case.”
 

 (C.R. 508.)
 

 In
 
 Gavin v. State,
 
 891 So.2d 907, 993-94 (Ala.Crim.App.2003), we stated:
 

 “Finally, Gavin contends that ‘the fact that the codefendant, Dewayne Meeks, was allowed to walk away without prosecution, creates a severe disproportionality’ in his sentence of death, see § 13A-5—53(b)(3), and that the trial court should have considered the fact that Meeks was not prosecuted as a mitigating circumstance. (Gavin’s brief at p. 131.)
 

 “Although Meeks was initially charged with the capital murder, that charge was dismissed because the prosecutor and the investigators believed that Meeks was not a participant in the murder. Meeks testified at trial that he did not participate in the murder, but that when Gavin got out of the car, he thought Gavin was going to ask the driver of the van for directions. Nothing in the record supports Gavin’s assertion that Meeks was a participant in the murder and that Meeks’s lack of prosecution should have been considered by the trial court. Compare
 
 Ex parte Burgess,
 
 811 So.2d 617 (Ala.2000)(holding that the trial court should have considered in mitigation the fact that Burgess was the only one of six participants in the crime (two of whom admitted that they participated in the crime) who was charged with, and prosecuted for, the murder). Thus, we find no error on the part of the trial court in not finding the fact that Meeks was not prosecuted to be a mitigating circumstance.”
 

 This case is analogous to
 
 Gavin.
 
 Here, the court found, after listening to Annette’s lengthy testimony and all the other evidence, that Belisle had a higher degree of culpability than Annette.
 

 “This is not a situation like the one presented to the Alabama Supreme Court in
 
 Ex parte Burgess,
 
 811 So.2d 617 (Ala.2000), where Burgess was the only one of six participants who was charged with, and prosecuted for, the murder. Here, we do not know the ultimate sentence that Middleton received. He had not been tried when Dorsey was convicted and sentenced. Also, the testimony showed that Dorsey
 
 *321
 
 shot and killed both Scott Williams and Timothy Bryan Crane. The testimony showed that Dorsey had a higher degree of culpability than did Middleton. We do not believe that the trial court erred in not finding his codefendant’s sentence to be a nonstatutory mitigating circumstance. As the Alabama Supreme Court stated in
 
 Ex parte Ferguson,
 
 814 So.2d 970 (Ala.2001), ‘ “ ‘While
 
 Lockett [v. Ohio,
 
 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.’ ” ’
 
 Id.
 
 at 976, quoting
 
 Ex parte Slaton,
 
 680 So.2d 909, 924 (Ala.1996).”
 

 Dorsey v. State,
 
 881 So.2d 460, 531 (Ala.Crim.App.2001) (opinion on return to remand), rev’d on other grounds, 881 So.2d 533 (Ala.2003).
 

 Nor is Belisle’s sentence of death disproportionate because of Annette’s 20-year sentence.
 

 “ ‘The law does not require that each person involved in a crime receive the same sentence.
 
 Wright v. State,
 
 494 So.2d 726, 739 (Ala.Crim.App.1985) (quoting
 
 Williams v. Illinois,
 
 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)). Appellate courts should “examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.”
 
 Beck v. State,
 
 396 So.2d 645, 664 (Ala.1980). However, the sentences received by codefen-dants are not controlling per se,
 
 Hamm v. State,
 
 564 So.2d 453, 464 (Ala.Crim.App.1989), and this Court has not required or directed that every person implicated in a crime receive the same punishment.
 
 Williams v. State,
 
 461 So.2d 834, 849 (Ala.Crim.App.1983),
 
 rev’d on other grounds,
 
 461 So.2d 852 (Ala.1984). “ ‘There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant, receives a lesser sentence.’ ”
 
 Id.
 
 (quoting
 
 Collins v. State,
 
 243 Ga. 291, 253 S.E.2d 729 (1979)).’
 

 “Ex parte McWhorter,
 
 781 So.2d 330, 344 (Ala.2000). ‘Because of “the need for individualized consideration as a constitutional requirement in imposing the death sentence,”
 
 Lockett v. Ohio,
 
 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (1978), the focus must be on the defendant.’
 
 Wright v. State,
 
 494 So.2d 726, 740 (Ala.Crim.App.1985), aff'd, 494 So.2d 745 (Ala.1986).”
 

 Gavin v. State,
 
 891 So.2d at 994. For the foregoing reasons, we find no error.
 

 C.
 

 Belisle argues that the court erred in counting both robbery and burglary as two aggravating circumstances.
 

 We specifically held in
 
 Stewart v. State,
 
 730 So.2d 1203 (Ala.Crim.App.1996) (opinion on second return to remand), aff'd, 730 So.2d 1246 (Ala.1999), that when there is proof that a murder occurred during the commission of two felonies enumerated in § 13A-5-49(4), Ala.Code 1975, both felonies may be considered two separate aggravating circumstances. We stated:
 

 “We hold that the aggravating circumstance enumerated in § 13A-5-49(4) may apply more than once if the accused murders another while committing any variation of the four enumerated felonies contained in § 13A-5-49(4), Code of Alabama 1975. The appellant committed the murder during the course of committing two felonies: burglary and kidnapping. The fact that § 13A-5-49(4) lists four different felonies under the single heading of aggravating circumstances does not mean that this circumstance could be applied only once in any given case. To hold otherwise would be to say
 
 *322
 
 that a person could commit a murder during the course of committing any number of the felonies enumerated in § 13A-5-49(4) and face no additional consequences at the penalty phase and in fact be considered to have committed only one of the felonies contained in this section. This was not the intent of the legislature. The legislature’s use of the words
 
 or
 
 in the above section supports this holding.”
 

 Stewart,
 
 730 So.2d at 1212. See also
 
 Calhoun v. State,
 
 932 So.2d 923 (Ala.Crim.App.2005).
 

 XXVI.
 

 Belisle argues that the cumulative effect of the errors entitles him to new trial and sentencing. We have diligently reviewed the record and find no evidence that the cumulative effect of any of the indicated errors affected Belisle’s substantial rights. See
 
 Ex parte Woods,
 
 789 So.2d 941 (Ala.2001).
 

 XXVII.
 

 Last, as required by § 13A-5-52, Ala.Code 1975, we address the propriety of Belisle’s death sentence.
 

 Belisle was indicted and convicted of murdering Joyce Moore during the course of a robbery and a burglary, violations of §§ 13A-5-40(a)(2) and 13A-5-40(a)(4), Ala.Code 1975. Belisle waived the jury’s participation at sentencing. The circuit court sentenced Belisle to death.
 

 A review of the record shows that Beli-sle’s death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
 

 The trial court found two aggravating circumstances — that the murder was committed during the course of a robbery and that the murder was committed during the course of a burglary. The circuit court considered the statutory mitigating circumstances contained in § 13A-5-51, Ala.Code 1975, and found none to exist. The trial court also considered nonstatutory mitigating circumstances, Annette’s lenient sentence and Belisle’s statements in court concerning remorse. See § 13A-5-52, Ala.Code 1975. The trial court considered them and found them not to constitute mitigating circumstances. We agree with the circuit court’s findings.
 

 As required by § 13A-5-53(b)(2), Ala.Code 1975, we have independently weighed the aggravating and the mitigating circumstances. Belisle brutally bludgeoned Moore to death' — using as a weapon a six-pound can of peas and an metal rod. We agree with the trial court that death was the appropriate sentence in this case.
 

 Section 13A-5-53(b)(3), Ala.Code 1975, also requires that we determine whether Belisle’s sentence was disproportionate or excessive to sentences imposed in similar cases. Belisle’s sentence was neither. See
 
 Flowers v. State,
 
 922 So.2d 938 (Ala.Crim.App.2005) (robbery/murder);
 
 Walker v. State,
 
 932 So.2d 140 (Ala.Crim.App.2004) (burglary/murder);
 
 Brooks v. State,
 
 695 So.2d 176 (Ala.Crim.App.1996) (robbery/murder);
 
 Gaddy v. State,
 
 698 So.2d 1100 (Ala.Crim.App.1995)(robbery/mur-der);
 
 Bush v. State,
 
 695 So.2d 70 (Ala.Crim.App.1995) (robbery/murder).
 

 Last, as required by Rule 45A, Ala. R.App.P., we have searched the record for any error that may have affected Belisle’s substantial rights and have found none. Accordingly, Belisle’s capital-murder convictions and sentence to death are due to be, and are hereby, affirmed.
 

 AFFIRMED.
 

 BASCHAB, P.J., and SHAW, WISE, and WELCH, JJ., concur.
 

 [1]
 

 . To protect the anonymity of the jurors we are using initials.
 

 [2]
 

 . Prospective juror M.A. was Belisle’s last strike and served as the second alternate. He was excused before deliberations.
 

 [3]
 

 . Section 13A-5-54, Ala.Code 1975, states:
 

 "Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years’ prior experience in the active practice of criminal law.”
 

 [4]
 

 . The record shows that Belisle had several different attorneys in this case.
 

 [5]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [6]
 

 . We have held that curative instructions are sufficient to cure many errors. See
 
 Smith v. State,
 
 797 So.2d 503 (Ala.Crim.App.2000) (curative instruction cured error of admitting witness's prior statement to police);
 
 Living v. State,
 
 796 So.2d 1121 (Ala.Crim.App.2000) (instruction was sufficient to cure prosecutor’s improper argument);
 
 Reed v. State,
 
 717 So.2d 862 (Ala.Crim.App.1997) (curative instruction sufficient to cure witness's nonre-sponsive comment that defendant had previously beaten her);
 
 Stanton v. State,
 
 648 So.2d 638 (Ala.Crim.App.1994) (curative instruction sufficient to cure nonresponsive witness's comment that defendant had previously been in prison);
 
 Connolly v. State,
 
 539 So.2d 436 (Ala.Crim.App.1988) (curative instruction cured nonresponsive witness's answer that
 
 *301
 
 defendant had invoked his right to remain silent).
 

 [7]
 

 . A defendant has no absolute right to the disclosure of the criminal histories of State witnesses. See
 
 Wright v. State,
 
 424 So.2d 684 (Ala.Crim.App. 1982).
 

 [8]
 

 . We note that Annette had not pleaded guilty to felony murder before Belisle’s trial.
 

 [9]
 

 . At the time of Belisle’s trial, Annette had not yet been convicted of any offense related to the events that occurred on May 19, 1999.
 

 [10]
 

 . This Court attempted to supplement the record with this exhibit. However, the court reporter executed an affidavit that stated: "Court’s Exhibit 5, Rick Belisle's written statement waiving jury participation in the case, is missing from the court file and cannot be produced."
 

 [11]
 

 . The presentence report also shows that Belisle refused to speak with the probation officer who was compiling the presentence report. He signed a form acknowledging that he did not wish to cooperate with the probation officer.
 

 [12]
 

 . The circuit court also conducted a similar detailed colloquy at the sentencing hearing before the court when Belisle indicated that he did not wish to present any mitigating evidence.
 

 [13]
 

 . Section 13A-5-44(c), Ala.Code 1975, states:
 

 "Notwithstanding any other provision of law, the defendant with the consent of the state and with the approval of the court may waive the participation of a jury in the sentence hearing provided in Section 13A-5-46. Provided, however, before any such waiver is valid, it must affirmatively appear in the record that the defendant himself has freely waived his right to the participation of a jury in the sentence proceeding, after having been expressly informed of such right.”
 

 [14]
 

 . Since our decision in
 
 Bryant,
 
 the United States District Court for the Northern District of California has held that California’s lethal-injection protocol, "as actually administered in practice,” violates the Eighth Amendment. See
 
 Morales v. Tilton,
 
 465 F.Supp.2d 972, 974 (N.D.Cal.2006). See our discussion in
 
 Brooks v. State,
 
 973 So.2d 380, 421 n. 13 (Ala.Crim.App.2007).
 

 [15]
 

 . As we noted previously, Belisle waived the jury’s participation in the sentencing hearing.
 

 [16]
 

 . The presentence report shows that Belisle had two prior convictions for burglary — one in 1988 and one in 1989. Both convictions occurred in Kansas.